ATOMIC FUEL EXTRACTION COR-
PORATION, Appellant,

v.

ESTATE of Tom SLICK et al., Appellees.

No. 14282.

Court of Civil Appeals of Texas.

San Antonio.

Dec. 30, 1964.

Rehearing Denied Jan. 27, 1965.

Sears & Burns, Houston, W. R. Smith, San Antonio, Haskell, Helmick, Carpenter & Evans, John H. Tippit, Denver, Colo., for appellant.

Carl Wright Johnson, Nat L. Hardy, San Antonio, Holland & Hart, Denver, Colo., Stahl & Sohn, Cox, Smith & Smith, San Antonio, for appellees.

POPE, Justice.

Plaintiff, Atomic Fuel Extraction Corporation, sued Transworld Resources Corporation, Nuclear Resources, Inc., and Tom Slick, who died after suit was filed. The parties will be called Atomic, Transworld, Nuclear, and Slick, respectively. Atomic during 1957 owned a milling contract issued by the Atomic Energy Commission, which would terminate if $2,000,000 was not made available to assure construction of the mill. Atomic charges that the three defendants agreed to furnish the funds but failed to do so. It asserted damages of more than four million dollars under four alternative causes of action: breach of contract, breach of an agent's fiduciary duty, fraud, and tortious interference with a contract. After a lengthy trial, the court granted all defendants' motions for instructed verdict.

Atomic had contracts with both Transworld and Nuclear but it seeks to reach Slick by invoking the doctrine that those corporate entities should be disregarded. In order, we shall discuss our conclusions that Atomic raised fact issues which prevented an instructed verdict for either Transworld or Nuclear, but that Atomic only proved nominal damages against them; that Atomic failed to prove grounds to disregard the corporate entities with whom it chose to contract, and that the instructed verdict for Slick was proper since Atomic's actions, save the one on contract, are barred by the two-year statute of limitations.

We shall discuss the contractual origin of this controversy. Atomic, during 1956, obtained a contract from the Atomic Energy Commission which entitled it to construct a uranium mill in Colorado. The contract would terminate unless Atomic began the mill construction by June 1, 1957. Atomic was able to get an extension of time, but the extension provided for an automatic termination on October 1, 1957, in these words: " * * * unless by said date the Contractor (Atomic) has in its possession and available for the performance of this contract Two Million Dollars ($2,000,000) in cash in excess of its current liabilities, and the Commission has by the same date received clear and convincing written proof thereof, which proof shall be in the form of a contractual agreement between Atomic Fuel Extraction Corporation and the party or parties providing such money."

John Black, an officer and the moving force in Atomic, in July of 1957, wrote Slick Oil Company in San Antonio in an effort to interest that firm in Atomic's uranium venture and to obtain the necessary finances for the mill. This letter resulted in a conference in Denver on July 16, between Black and other officers of Atomic and James V. McGoodwin and others from San Antonio. This conference led to the execution of what is called a letter of agreement dated July 18, 1957. This document is not the basis of the action on contract, but it led up to the actual contracts, called the August 13 letter agreement and the August 16 merger agreement. On August 13, 1957, Transworld submitted a letter agreement

to Atomic. It was signed by McGoodwin for Transworld, and was signed and accepted by all of the directors for Atomic. Since this is one of the two documents upon which Atomic grounds its contract action, we shall set forth its relevant portions:

"Informal discussions with the Atomic Energy Commission indicate that performance of the management contract, as discussed in the letter of Agreement, will not satisfy the Atomic Energy Commission requirements under your contract with that agency for a mill operation. Furthermore, the ore supply for the proposed mill is not certain due to the questionable validity of your contract with Beaver Mesa Company concerning certain uranium lode mining claims.

"Notwithstanding these difficulties, Transworld is willing to undertake the construction and operation of a uranium mill under your contract with the Atomic Energy Commission on the following terms and conditions:

1. Atomic Fuel either will be merged into a corporation designated by Transworld or will transfer all of its assets and liabilities to the designated corporation, the alternative to be at the option of Transworld. In either event the consideration will be delivery of at least 25% of the then issued and outstanding stock of the designated corporation to the stockholders of Atomic Fuel or to it, depending on the alternative followed.

2. (Omitted.)

3. Transworld is satisfied that Atomic Fuel has a good possessory title to its mining claims, a list of which will be supplied to Holland & Hart, attorneys, by August 23, 1957, with the exception of the Echo-Hatch group as to which there is a dispute regarding ownership.

4. The liabilities and debts of Atomic Fuel do not exceed $300,000.00, based upon a thorough audit of the books of Atomic Fuel by Peat, Marwick, Mitchell & Co.

5. Transworld is able to obtain an ore supply of a quantity and quality sufficient to meet the production commitments to the Atomic Energy Commission in the mill contract referred to above.

6. The ore supply is amenable to processing by the method contemplated by Transworld.

7. (Omitted.)

8. The officers and directors of Atomic Fuel cooperate fully with Transworld and the designated corporation to secure the approval of the stockholders of Atomic Fuel for all necessary corporate action.

9. All of the foregoing matters, with the exception of 2(d), must be accomplished not later than September 20, 1957."

Investigations disclosed that the AEC would not approve a mere assignment of Atomic's milling contract to another firm. The AEC required a merger. Because Transworld owned mineral interests other than uranium and related ores, and it was intended to keep the Atomic venture separate, it was determined that a new corporation would be formed which would merge with Atomic. On August 16 Nuclear Resources was incorporated in Colorado, and on that date Nuclear and Atomic executed the merger agreement. It detailed the method of the merger and imposed a condition precedent upon Atomic in these words: "subject to the conditions hereinafter contained, the merger provided for herein will become effective as of the close of business on September 20, 1957." Nuclear would be the surviving corporation, would exchange its stock for Atomic's in the proportion pro-

vided, would become vested with Atomic's assets, and charged with its debts. Article VII of the merger agreement stated, among other things, that the merger "shall be effective only if the following conditions are met:

"(2) Nuclear is satisfied that the conditions stated in a certain Letter of Intent dated August 13, 1957, from Transworld Resources Corporation to Atomic have been met.

"(3) * * * Despite approval of the merger by the stockholders, the merger may, by action of the Board of Directors of Nuclear, be abandoned at any time prior to the actual filing of this agreement with the Secretary of State of Colorado, and any decision so to abandon the merger shall rest solely in the discretion of the said Board of Directors."

The next day, August 17, Atomic's Board of Directors ratified both the August 13 letter agreement and the August 16 merger agreement. On August 21, Atomic and Transworld agreed to some changes in the August 13 letter agreement. The changes substituted Nuclear for Transworld, extended the dead-line for compliance with the conditions precedent, from September 20 to September 25, and added this paragraph:

"9. The plan under which Nuclear acquires the assets and liabilities of Atomic Fuel shall be mutually satisfactory to legal counsel for this corporation (Atomic), Nuclear and Transworld and further that said plan can be legally and effectively carried out within the time permitted by the Atomic Energy Commission and the provisions of Contract No. AT(05-1)-698."

On September 25, 1957, the stockholders of Atomic met and approved the merger with Nuclear. The next day this telegram was sent to the AEC:

"Transworld Resources, Inc. hereby commits Two Million Five Hundred Thousand Dollars for the construction of the Bedrock, Colorado mill subject only and solely to the completion of the ore purchase negotiations now in progress to fulfill the AEC contracts for said mill and the conditions relating to the extension of that contract AT(05-1) 698. Copy to J. V. McGoodwin.

Tom Slick, Chairman of the Board Transworld Resources, Inc."

The AEC did not regard this as a compliance with its requirement that $2,000,000 in cash must be furnished. On September 30, the day before the terminal date of the AEC milling contract, Slick, McGoodwin and others met with representatives of the AEC in Washington and were told that the only way Atomic's AEC contract could be preserved was "to come up with two million dollars in cash in excess of current liabilities like the contract called for." Slick was trying to get an extension of time to October 30. On October 1, this telegram was sent by C. V. Wood, President of Transworld Resources, Inc., to J. V. McGoodwin, President, Nuclear Resources, Inc.:

"Pursuant to action of the Board of Directors of this company taken in response to a proposal from you, we hereby commit to you two and one half million dollars to comply with the provisions of the financial requirement of the modification to contract AT-05-1968. You are hereby authorized to expend such fund in accordance with said contract as now or hereafter modified by the Atomic Energy Commission and whether the mill shall be built at Bedrock, Colorado or elsewhere but for no other purpose if the proposed merger with Atomic Fuels has not yet been completed you are authorized at your discretion to commit to Atomic Fuels such funds as may be necessary under said contract as now or hereafter amended amounts expended hereunder shall be repayable on or before April First 1962, together

with interest at the rate of six per cent per year and security shall be arranged by incumberance on the mill sight and townsight and improvements thereon. And by assignment to this company of the proceeds to be derived from the sale of uranium concentrates under the terms of said contract. We hereby agree to renegotiate the security to be guaranteed hereunder upon completion of the final financing of this project to the end that the financial interest finally concerned shall be adequately secured."

The AEC decided this still did not meet their requirements and terminated the milling contract as of October 1, 1957. Atomic asserted damages for defendants' breach of the August 13 letter agreement in failing to provide the necessary finances for construction of the mill and for breach of the August 16 merger agreement. Defendants contend that the instructed verdict should be upheld because Atomic failed to meet the several conditions precedent stated in the August 13 letter agreement. Among those conditions was the one that Transworld must be "satisfied" that Atomic has a good possessory title to its mining claims. Others were that the ore supply must be sufficient, must be amenable to processing by the methods contemplated by defendants, and Atomic's debts must not exceed $300,-000. Nuclear, by its merger agreement, was to be satisfied about all of these conditions.

■ Atomic rightly urges that a jury issue was raised on its compliance with these conditions precedent. It presented evidence which a jury could believe that showed (1) that defendants were in fact satisfied and said so, (2) that defendants' claimed dissatisfaction was not in good faith, and (3) that defendants prevented Atomic's compliance. Black testified that on September 25, 1957, just after Atomic's stockholders had approved the merger, he, a Mr. Turner and McGoodwin, President of Nuclear, conferred in a hotel room. We find this question and answer:

"Q Was anything said by anyone else concerning ore or ore supply for the mill on that occasion?

"A Yes, sir, there was. Mr. Turner had his brief case there, and he removed some fifteen copies of an ore commitment contract that I had prepared for him to take around and get signed, and handed them—or laid them on the bed in front of Mr. McGoodwin and said, 'Here are fifteen more ore commitments from miners in this area.' And Mr. McGoodwin said 'We won't need those. We have plenty of ore available.' And he handed them back to Turner."

This is some evidence of an admission of satisfaction prior to October 1, 1957, which defendants later denied.

■ Whether the defendants' dissatisfaction about the conditions was feigned or in good faith is a fact issue. Coker v. Wesco Materials Corporation, Tex.Civ. App., 368 S.W.2d 883, 13 Tex.Jur.2d, Contracts, § 301. As stated in 5 Williston on Contracts (3rd Ed.) § 675A: "It has been questioned whether an agreement in which the promise of one party is conditional on his own or the other party's satisfaction contains the elements of a contract—whether the agreement is not illusory in character because conditioned upon the whim or caprice of the party to be satisfied. Since, however, such a promise is generally considered as requiring a performance which shall be satisfactory to him in the exercise of an honest judgment, such contracts have been almost universally upheld." The decision must be made in good faith. Golden State Mutual Life Ins. Co. v. Kelley, Tex.Civ.App., 380 S.W.2d 139, 141; 3A Corbin on Contracts, § 465; 86 A.L.R.2d 205; 44 A.L.R.2d 1125.

One situation which occasioned the condition precedent that Transworld and Nu-

clear must be "satisfied" was that Atomic, prior to its contracts with defendants, had fallen into a dispute with Beaver Mesa, Inc., about some mining claims and ore deposits. Of course, defendants had to know whether there was adequate ore available for a uranium mill if they were to finance it. Defendants, at the trial, contended that this dispute with Beaver Mesa was not finally settled by the September 25 deadline, and that the availability of mining claims and ore deposits was not assured to their satisfaction. Atomic meets this contention by proof that defendants thrust them out of the settlement negotiations with Beaver Mesa and prevented their efforts to reach a settlement.

Atomic presented proof that defendants were primarily interested in re-negotiating the Atomic-Beaver Mesa contract so they could obtain the economic advantages of the depletion allowance. Instead of ore delivered to the mill, defendants wanted ore in place. To achieve this, as well as the settlement of the dispute with Atomic, McGoodwin took over the negotiations with Beaver Mesa. Black testified that during September of 1957 McGoodwin and his attorneys conducted conferences with Beaver Mesa. McGoodwin reported to him that defendants "were trying to get—to buy the ore in the ground and then contract with Simpson Mining Company to mine it and so—that they could take advantage of this depletion situation and he further discussed the fact that the only thing that seemed to be left to determine was the costs—mining costs. They had agreed on everything else in principle but the mining costs."

■ Black testified that he and another director of Atomic both offered to assist McGoodwin in these negotiations, but "Their reply was that they didn't want him to monkey with it." Black's testimony is borne out by documentary evidence. On September 24, defendants' attorney handed Black a copy of a memo which summarized the terms of the settlement and at that time told Black "the negotiations with Beaver Mesa had been finalized and that all that was necessary was to reduce it to a formal contract." Black's testimony that the final settlement contract was never signed is the fact which defendants say was conclusive proof of non-compliance with the conditions about adequate mining claims. The memo is in evidence. It shows, as Black testified, a settlement of the dispute and a revised method of acquisition of the ore in place. The memo was prepared by Beaver Mesa's attorney and then forwarded to Nuclear's attorney for his preparation of the formal contract, which was never done. The memo was not a contract, nor was it offered as such. It was, however, evidence which supported Black's testimony that Atomic was excluded from these settlement negotiations, that defendants preempted the field, and succeeded in changing the original agreement on terms more satisfactory to Nuclear. This bears out Black's testimony that Nuclear's real concern was in purchasing ore in place and not the claimed dispute between Atomic and Beaver Mesa. In our opinion, this proof is sufficient to raise a fact issue about defendants' prevention of compliance with the condition precedent it now insists upon. "The principle that prevention by one party excuses performance by the other, both of a condition and of a promise, may be laid down broadly for all cases." 5 Williston on Contracts (3rd Ed.), § 677.

Another condition precedent required by paragraph 4 of the August 13 letter agreement was that Atomic's debts must "not exceed $300,000, based upon a thorough audit of the books of Atomic Fuel by Peat, Marwick, Mitchell & Co." That accounting firm made the audit and then expressed no opinion. The report was, "Because we have not been able to satisfy ourselves as to the correctness of substantial amounts relating to assets and liabilities of the corporation as of June 30, 1957, we are not in a position to express an opinion on the accompanying balance sheet." This was not a compliance with the condition precedent.

Atomic offered evidence, however, to raise a fact issue on whether defendant Nuclear, by its acts and conduct, waived this condition.

█ Performance of conditions precedent can be waived. The waiver may be by words or deeds or both. "It is immaterial how the promisor manifests his intention to fulfil the prior duty without the performance of the condition thereof. Whether he speaks of waiver or uses other words in this connection is of no consequence, if the undertaking to perform is made plain." Restatement, Contracts, § 88, Comment c.; Equitable Life Assurance Society v. Ellis, 105 Tex. 526, 147 S.W. 1152; Bankers Life & Loan Ass'n of Dallas v. Ashford, Tex.Civ.App., 139 S.W.2d 858; Childress v. Cook, 5 Cir., 245 F.2d 798.

█ There is evidence that defendants waived the condition precedent about Atomic's debts. On September 25, 1957, the contract terminated if the condition was not met. On that date Slick, as chairman of Transworld's Board, sent the telegram to AEC committing two and a half million dollars "subject only and solely to the completion of the ore purchase negotiations." Atomic's debts were not mentioned. McGoodwin, Slick and others were in Washington on September 30 and October 1, 1957, arguing to the AEC that the contract with Atomic was in force and they were seeking an extension of the AEC milling contract. Still treating the contract with Atomic as in force, on October 1, the President of Transworld unconditionally committed two and a half million dollars to Nuclear for the mill construction. In December, 1957, McGoodwin, as President of Nuclear, still regarded the merger deal as pending, the September deadline having long since passed. He sent Black this telegram:

"Nuclear Resources herewith commits to conclude its pending merger deal with Atomic Fuels immediately on conclusion of a satisfactory extension of Atomic Fuels' mill contract from the A.E.C. which as a minimum would restore the time schedule which according to the A.E.C. letter of July 9, 1957 date applied on October 1. Responsible reserve studies and financial commitments should assure prompt and successful culmination of the project."

If the contract had terminated, how could the merger still be pending? As late as June, 1958, McGoodwin was in correspondence with other prospective investors and still taking the position that the merger was planned. On September 11, 1958, McGoodwin sent Black a telegram with respect to a proposed merger of Atomic with another company, and in it he wrote, "said merger will not affect the proposed merger with Nuclear Resources." For months after the deadline for compliance with the condition, Nuclear still recognized its contract with Atomic. It never raised the point about Atomic's excessive debts either with Atomic, other investors, or the AEC. There was evidence of waiver of the condition precedent about Atomic's debts.

We come now to defendants' contention that it reserved sole right to abandon the merger as provided in the August 16 merger agreement. The contract provided: "Despite approval of the merger by the stockholder, the merger may, by action of the Board of Directors of Nuclear, be abandoned at any time prior to the actual filing of this agreement with the Secretary of the State of Colorado, and any decision so to abandon the merger shall rest solely in the discretion of the said Board of Directors." Defendants argue that the agreement was never filed with the Secretary of the State of Colorado and until it was, they could abandon it. This provision, while granting much to Nuclear's discretion—or judgment—, had other requirements. The power to abandon was upon (1) action of the Board of Directors, (2) a decision, (3) exercise of discretion. All of the evidence is that there was never any action of the Board of Directors nor a decision by them with respect to abandonment

of the merger. There was never a meeting after its first organization meeting.

Nuclear's president, McGoodwin, pursued a course prior to and following the September 25 deadline which excluded any idea of abandonment. On September 26, the day after the deadline, McGoodwin was still trying to raise the money. The following day he was in conference with the AEC Operations Office in Grand Junction, when he argued that the money had been raised. McGoodwin told the AEC officials that "Completion of the statutory merger was wholly within the control of Nuclear Resources, Inc., and could be accomplished at any time deemed feasible." McGoodwin flew to Washington, and on September 30, after conferences with Slick and the AEC, informed Black of Atomic that financial arrangements had been completed. Eight days later he assured Black that the AEC contract would be extended, though the October 1 deadline had already passed. For months thereafter Nuclear's officers and stockholders diligently sought to save the contract. During that time there was no indication to Atomic that any decision had been made or action taken to abandon the merger. We mention this, not on the point of waiver but as evidence from which a fact finder could infer that the Nuclear decision to abandon was never made. We conclude that there is no basis for an instructed verdict for Transworld and Nuclear on the claimed grounds that Atomic failed to meet the conditions stated in the two contracts. These were issues of fact.

All defendants claim, however, that Atomic failed in its proof on the element of damages since it only proved speculative lost profits for a new and unestablished business. Atomic alleged as to each of the alternative causes that it lost sales of uranium concentrates amounting to $9,289,-212, and of vanadium concentrates amounting to $6,006,500, a total of $15,295,712. It claimed one-fourth of that amount under the terms of the merger agreement.

Since the decision in Southwest Battery Corporation v. Owen, 131 Tex. 423, 115 S.W.2d 1097, Texas has permitted recovery of lost profits to a business that can prove it is established and making profits at the time a contract is breached or a tort committed. That case explains that pre-existing profits, together with other facts and circumstances, may supply the reasonable certainty required both as to the fact of damages and the amount. The success of an enterprise, measured in profits, is dependent upon a multitude of risks, chances and circumstances; and without some history of profits there is inadequate data upon which to prove the fact of damages with the certainty required. A new and unestablished business without a profit record leaves too much to conjecture and speculation.

Atomic meets this weakness of proof by argument that profits were within the contemplation of the parties. Hadley v. Baxendale, 9 Exch. 341; McGuire v. Osage Oil Corporation, Tex.Com.App., 55 S.W.2d 535. That too is a rule of certainty which a claimant must meet, but it is in addition to the one that applies to future profits of a new and unestablished business. In our opinion, profits were surely contemplated by all the parties, but the argument misses the point. See United Iron Works v. Twin City Ice & Creamery Co., 317 Mo. 125, 295 S.W. 109, 113.

In Southwest Battery Corporation v. Owen, supra, because there was an established business, future profits were allowed. In those Texas cases which have permitted recovery, there was some data and history of profits from an established business. Pace Corporation v. Jackson, 155 Tex. 179, 284 S.W.2d 340; City of San Antonio v. Royal, Tex., 16 S.W. 1101; National Bank of Cleburne v. M. M. Pittman Roller Mill (Tex.Com.App.1924), 265 S.W. 1024, 36 A.L.R. 1405; Berne v. Keith, Tex.Civ.App., 361 S.W.2d 592, 599; Adams v. Hood County Sand & Gravel Company, Tex.Civ.App., 354 S.W.2d 593; Richker v. Georgan-

dis, Tex.Civ.App., 323 S.W.2d 90; Rios v. Lowenfield, Tex.Civ.App., 289 S.W.2d 332; Schoenberg v. Forrest, Tex.Civ.App., 253 S.W.2d 331, 334; Schoenberg v. Forrest, Tex.Civ.App., 228 S.W.2d 556; Gregory v. Reynolds, Tex.Civ.App., 219 S.W.2d 107; International Union of Operating Engineers, etc. v. Cox, Tex.Civ.App., 212 S.W. 2d 1000, 1003; Joyce v. Anderson-Bledsoe Stave Co., Tex.Civ.App., 173 S.W.2d 315; Purvis & Bertram v. Shaw, Tex.Civ.App., 164 S.W.2d 416; Payne Advertising Agency v. Wilhelm, Tex.Civ.App., 145 S.W. 2d 641; Belcher v. Bullion, Tex.Civ.App., 121 S.W.2d 483; Graham Hotel Co. v Garrett, Tex.Civ.App., 33 S.W.2d 522; McArthur v. Day, Tex.Civ.App., 19 S. W.2d 134; Big Four Ice & Cold Storage Co. v. Williams, Tex.Civ.App., 9 S. W.2d 177; Bagby v. Hodge, Tex.Civ. App., 297 S.W. 882; Settegast v. Foley Bros. Dry Goods Co., Tex.Civ.App., 297 S.W. 676; Merchants Life Ins. Co. v. Griswold, Tex.Civ.App., 212 S.W. 807, 812; Grand Prairie Gravel Co. v. Joe B. Wills Co., Tex.Civ.App., 188 S.W. 680; American Const. Co. v. Caswell, Tex. Civ.App., 141 S.W. 1013; American Const. Co. v. Davis, Tex.Civ.App., 141 S.W. 1019.

■ In sharp contrast with those precedents are those which have consistently denied future profits when the business was new and unestablished. Wissman v. Boucher, 150 Tex. 326, 240 S.W.2d 278, 281; National Bank of Cleburne v. M. M. Pittman Roller Mill, supra; Edwards v. Ward Associates, Inc., Tex.Civ.App., 367 S.W.2d 390, 395; Barbier v. Barry, Tex. Civ.App., 345 S.W.2d 557, 563; Harrison-Daniels Co. v. Aughtry, Tex.Civ.App., 309 S.W.2d 879; Williams v. Saunders, Tex. Civ.App., 243 S.W.2d 596, 600; Silberstein v. Laibovitz, Tex.Civ.App., 200 S.W.2d 647, 650; Page v. Hancock, Tex.Civ.App., 200 S.W.2d 421, 423; C. V. Hill & Co. v. Parker, Tex.Civ.App., 145 S.W.2d 330; Central Freight Lines v. York, Tex.Civ.App., 135 S.W.2d 186; First Nat. Bank of Quinlan v. Donohoe, Tex.Civ.App., 293 S.W. 217; Texas Power & Light Co. v. Roberts, Tex.

Civ.App., 187 S.W. 225; 1 A.L.R. 156; Walter Box Co. v. Blackburn, Tex.Civ. App., 157 S.W. 220; Fraser v. Echo Mining & Smelting Co., 9 Tex.Civ.App. 210, 28 S.W. 714. The denial of damages for lost profits to a new and unestablished business is the general rule. 15 Am.Jur., Damages, § 157; 25 C.J.S. Damages § 42; McCormick, Damages, § 29; 1 Sutherland, Damages, § 67; 17 Tex.Jur.2d, Damages, § 148; 64 Harv.L.Rev. 317.

■ An established business should be one that is in actual operation long enough to give it permanency and recognition. It should be one that has earned a profit which can reasonably be ascertained and approximated. Carolene Sales Co. v. Canyon Milk Products Co., 122 Wash. 220, 210 P. 366, 367; Outcault Adv. Co. v. Citizens' Nat. Bank, 118 Kan. 328, 234 P. 988, 41 A.L.R. 194. A business in successful operation, if changed into a different form or line of business, may become a new and unestablished venture. Harrison-Daniels Co. v. Aughtry, supra; Silberstein v. Laibovitz, supra. Proof of an operation of a business at a loss fails to meet the test. Silberstein v. Laibovitz, supra; Walter Box Co. v. Blackburn, supra.

■ Atomic has not brought itself within the category of an established business. The venture in question is uranium and vanadium milling, admittedly a speculative one. Neither Atomic nor any of the defendants have ever previously had any experience in this industry. Plaintiff has never milled a ton of uranium or vanadium ore. There was no market for vanadium. Atomic has never made a profit during any year of its existence. With debts around $300,000, its income from all sources in 1957 was $6,874.42; in 1958 was $1,624.14, and in 1959 was $60.00. Although more than twenty firms had been approached, none of them were interested in Atomic's AEC milling contract. Atomic's expert metallurgist testified that during the period of the incidents involved in this suit, the uranium industry was declining, the "bloom

is off the rose," mills were "shutting down" or "selling the ore allocation to other mills." The AEC was unfriendly to Atomic, was not in favor of additional mills in the area, was "leveling off" in its uranium procurement during 1957, and informed Atomic in July of 1957, that there was no present need for the additional mill. The Atomic AEC contract was called, according to Atomic's expert, the first "poor contract" because the fringe benefits included in prior milling agreements were omitted. After November, 1958, the AEC began making purchases on a limited basis. Three mills were already serving the same area. The trial court properly regarded this venture as a new and unestablished business which was unable to prove that it had earned profits or ever would. While Atomic's AEC contract required $2,000,000 cash deposited by October 1, 1957, as evidence of its good faith to move forward, that sum did not represent the cost of a mill. That was about one-half of its cost. Atomic was unable to prove loss of profits with that measure of certainty which is required.

■ Atomic may be able to prove a breach of the contracts, and if so it would be entitled to nominal damages for breach of its rights. 17 Tex.Jur.2d, Damages, § 4; 25 C.J.S. Damages §§ 11, 12; McCormick, Damages, § 24. This defeats the instructed verdict in favor of the defendants. Wilson v. Hart, Tex.Civ.App., 332 S.W.2d 107; Hutchinson v. Texas Aluminum Co., Tex. Civ.App., 330 S.W.2d 895; Collier v. Bankston-Hall Motors, Inc., Tex.Civ.App., 267 S.W.2d 898; Monzingo v. Jones, Tex.Civ. App., 34 S.W.2d 662. It is suggested that Atomic should have asked the court to award nominal damages, and failing to do so, it can not assert error on appeal for that denial. Atomic has not yet been in a position to so move the court. Its right even to nominal damages is still undecided. Wafer v. Edwards, Tex.Civ.App., 248 S.W. 2d 320. The court could neither grant nor deny nominal damages until Atomic's right to them has been established or defeated. The judgment in favor of Transworld and Nuclear will be reversed and remanded for determination of Atomic's right, that is, whether defendants breached the contracts. 4 Tex.Jur.2d, Appeal & Error, § 869.

Atomic also contends that Tom Slick was the alter ego of Transworld and Nuclear and is liable on the contract. The evidence showed that Slick wholly owned Transworld. He furnished money as loans to Transworld in the sum of $474,762.36 between 1957 and 1959. It had no income and its assets were speculative mining claims valued by the evidence anywhere from nothing to seven million dollars. Nuclear was an outgrowth of the uranium milling venture and it too was wholly owned and financed by Tom Slick. It had no bank account and no financial records for 1957. Both Transworld and Nuclear's board of directors consisted of persons closely associated with Tom Slick. Neither corporation held stockholders' meetings. Transworld held three, and Nuclear only one directors' meeting during 1957. Following the AEC's decision to terminate the milling contract, but not before, Slick wrote letters and began negotiations with the AEC in an effort to salvage the contract. He wrote letters to others also and spoke of "our company," "a business venture which I have." McGoodwin, who was Vice-President of Transworld and President of Nuclear, was also an attorney for Slick. There were other facts which showed that both Transworld and Nuclear were dependent upon Slick for funds with which to operate.

■ In our opinion, however, the court properly instructed a verdict for defendant Slick. Atomic was never confused about the parties with whom it contracted. When it made its contracts with Transworld and Nuclear, it then knew about Slick, his position with respect to the two corporations, and that he was not a promisor. Atomic initiated negotiations with Slick Oil Company and knew McGoodwin represented Slick. It knew Slick was an officer of and wholly owned both corporations, and that

they depended upon him for their operating expenses. In the case of Nuclear, it was Atomic's plan, as well as that of Transworld, to create it as a new company. Certainly nobody was mistaken about its finances or its purpose. Black, the representative for Atomic, in all these transactions admitted he knew Nuclear had no assets—"didn't have a dime." Slick signed no agreements. He sent two telegrams to the AEC prior to October 1, 1957, and signed both as a corporate officer. At Atomic's stockholders' meeting to approve the merger with Nuclear, Slick's name was not mentioned as the one who was furnishing the finances.

Black, the attorney, director, secretary and dominating officer for Atomic, as well as the other officers and stockholders of Atomic, throughout all of the transactions with Transworld and Nucelar, had full information about Slick and knew that he was not a party to any contract with Atomic. No questions were raised and nobody asked Slick to bind himself personally. Atomic, with full knowledge, chose to deal with and continued to deal with the corporations to the exclusion of Slick. It was fully aware of the risks. Hanson v. Bradley, 298 Mass. 371, 10 N.E.2d 259, states the law which the trial court correctly applied:

> "The right and the duty of courts to look beyond the corporate forms are exercised only for the defeat of fraud or wrong, or the remedying of injustice. In the present case we have a corporation formed without substantial capital, relying on borrowing money to make valuable a hotel that it was buying on credit. The plaintiff dealt with that corporation. There is nothing to show that he was deceived. The fair inference is that he knew the worthlessness of the corporation with which he contracted, and knew that his contract was of no value unless the corporation could borrow money * *.

> "The plaintiff was not wronged by the fact that the corporation was organized with a trifling capital and could not live except upon borrowed money; nor by the fact that the lenders insisted on security. He knew the essential facts and accepted the situation."

The Texas decisions follow the same rule. Pace Corporation v. Jackson, 155 Tex. 179, 284 S.W.2d 340; Staacke v. Routledge, 111 Tex. 489, 241 S.W. 994; Noblitt v. Barker, Tex.Civ.App., 97 S.W.2d 1010; Seymour Opera-House Co. v. Wooldridge, Tex.Civ.App., 31 S.W. 234, 235. Accord, Farrier v. Hopkins, 131 Tex. 75, 112 S.W.2d 182.

 Atomic's other actions are barred by limitations. The pleadings and Black's testimony state that defendants defrauded Atomic "in the inception of the contract," that is, back in August of 1957. Atomic asked for damages for fraud and not rescission of the contract, and the actions are governed by the two-year statute of limitations. Lacy v. Carson Manor Hotel, Inc., Tex.Civ.App., 297 S.W.2d 367. The amended petition which asserted fraud was not filed until February 6, 1963. With that date in mind, we shall review the admitted evidence. Everyone knew what in fact had been done and had not been done with respect to the AEC's requirements by October 1, 1957. By October 4, it was known that the AEC did not regard Transworld's commitment as a compliance. In November, 1957, Black saw and talked to Slick for the first time and Black testified that Slick told him that he never intended to put up the money personally. Black testified "That is the first time I ever understood that he was not going to put it up right from the beginning of my negotiations." From that time on Black had knowledge. By January, 1958, Atomic knew that the contract would not be reinstated. Efforts to reinstate the contract or obtain a new contract were unavailing and Atomic knew this by May 2, 1958.

Anything that happened thereafter did not alter the fact of Black's knowledge, stated by Slick himself, that he had never intended personally to supply the cash to finance the mill. As early as 1958, Atomic had knowledge of facts that would cause a reasonably prudent person to make inquiry which would lead to a discovery of the claimed fraud. Wise v. Anderson, 163 Tex. 608, 359 S.W.2d 876. Such knowledge is in law knowledge of the fraud itself. More than five years later, Atomic asserted its tort actions. They are now barred.

The judgment must be reversed and the cause of action asserted against Transworld and Nuclear for breach of contract is remanded. The judgment in favor of Slick is affirmed. Costs are adjudged against Transworld and Nuclear.