**5636 ALPHA ROAD, a Joint Venture Consisting of Oscar Olchyk, Blaine A. Steinberg, Marianne R. Steinberg, J. Richard Whittington as Trustee for the Sara Crockett Whittington Trust, and Don Zelezny, Plaintiff,**

**v.**

**NCNB TEXAS NATIONAL BANK, n/k/a Nations Bank, Defendant.**

Civ. A. No. 3:93–CV–1304–D.

United States District Court, N.D. Texas, Dallas Division.

March 22, 1995.

Susan Barilich, Dallas, TX, for plaintiff.

Gordon M. Shapiro and Alan N. Greenspan of Jackson & Walker, L.L.P., Dallas, TX, for defendant.

**FITZWATER, District Judge:**

The instant motion for summary judgment presents questions concerning the liability of a bridge bank arising from a loan commitment made by its predecessor, a failed national bank. Among the issues presented is whether 12 U.S.C. § 1821(n)(4)(I), a provision of FIRREA,[1] should be applied retroactively.

I

This is an action by plaintiff 5636 Alpha Road, a Joint Venture ("Alpha"), against defendant NCNB Texas National Bank n/k/a NationsBank of Texas, N.A. ("NCNB").[2] Alpha contends NCNB is liable on theories of breach of contract, wrongful acceleration, usury, negligent misrepresentation, tortious interference with business relations,[3] and negligent spoliation of evidence, in connection with a loan commitment made by InterFirst

---

1. Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 1989 U.S.C.C.A.N. (103 Stat.) 183.

2. For clarity, the court will refer to defendant as NCNB in this opinion.

3. As the court explains below, although Alpha appears to allege in its amended complaint a claim for tortious interference with business relations, *see* P.2d Am.Compl. at ¶ 18, its summary judgment evidence is supported by allegations of tortious interference with contracts. These are distinct torts under Texas law.

Bank–Oak Cliff ("IFB") to provide permanent financing for land and an office building that Alpha owned.

Alpha alleges that IFB promised to loan Alpha the sum of $700,000, at an interest rate of 13% per annum, pursuant to a written agreement dated February 25, 1983. Payments were to be amortized on a 20–year basis, Alpha was to execute a deed of trust promissory note in the amount of $700,000 (the "Note"), and a new note was to be executed every three years. IFB required Alpha to pay the sum of $7,000 as a 1% loan commitment fee, as well as certain closing costs. Alpha contends that IFB funded $250,000 of the amount promised, but refused to advance the balance of $450,000. Alpha alleges that IFB neither refunded any of the fees it charged to make the loan, nor did it accurately reduce the amount of interest charged. Alpha avers that although it made all Note payments in a timely manner, and that IFB renewed the Note in 1986 for the purpose of adjusting the interest rate, NCNB should have but did not renew the Note in 1989, 1992, and 1995. Instead, NCNB renewed the Note in early 1989, but misled Alpha concerning the renewal terms. In February 1990 NCNB advised Alpha that it would not honor the loan commitment and extend the loan for the remainder of the 15–year period.

Alpha contends NCNB never rebated interest to Alpha, even though interest was amortized on a 20–year basis and the loan was effectively made for only a seven-year period; that NCNB arbitrarily refused to extend the Note notwithstanding that the bank was significantly oversecured and that all Note payments had been timely made; and that NCNB's conduct obligated Alpha to finance within a very short time the entire principal balance of $221,015.54. Alpha alleges that as a result of NCNB's actions, it lost all fees paid under the IFB loan commitment; sustained damages in the form of lost opportunity costs and investment revenues and the costs of borrowing money, caused by its venturers' having to liquidate their savings and investments and borrow additional funds; and paid excessive interest charges.

By stipulation filed November 17, 1993, Alpha has waived all pre-receivership claims against the Federal Deposit Insurance Corporation ("FDIC")–Receiver, who has been dismissed as a party-defendant. Alpha seeks to recover from NCNB. NCNB moves for summary judgment as to all of Alpha's claims.

II

A

■ The court first considers Alpha's usury claim. NCNB contends this action is barred because (1) Alpha released the claim in a modification of the Note; (2) the usury claim is based on pre-insolvency conduct, which Alpha has waived pursuant to the stipulation of dismissal of FDIC–Receiver; (3) the two-year statute of limitations prescribed by 12 U.S.C. § 86 bars the claim; and (4) the modification in question contained a usury savings clause, thus negating the requirement of § 86 that NCNB "knowingly" received usurious interest.

NCNB's fourth argument is dispositive of Alpha's usury claim. 12 U.S.C. § 86 provides that a national bank forfeits usurious interest when its conduct is "knowingly done." In order to avoid NCNB's limitations and release arguments, Alpha bases its usury claim upon the payment of usurious interest in August 1990. *See* P.Resp. at ¶¶ 8–9 (arguing that claim arose in August 1990, when Alpha paid off loan, and "[NCNB] caused its previous collection of unearned interest payments to become usurious."). As of August 1990, however, Alpha and NCNB had already entered into a Renewal, Extension, and Modification Agreement (the "Fifth Modification"), dated January 25, 1990. *See* Tom Cathey ("Cathey") Aff.Ex. A–8. Pursuant to the Fifth Modification, Alpha's debt was due and payable on July 26, 1990. *Id.* at ¶ 4. This modification contained ¶ 18, a savings clause.[4] When NCNB accelerated the Note,

---

4. Paragraph 18 of the Fifth Modification provides:

The parties intend to conform strictly to the applicable usury laws. All agreements between Lender and Borrower (or any other par-

it did so pursuant to the Fifth Modification, including ¶ 18. NCNB could not knowingly have committed usury, as required by § 86, because the savings clause precluded it from acting "knowingly."

■ To avoid summary judgment, Alpha relies on a Texas decision concerning the intent required for usury, and cites a page from the Cathey deposition, in which Cathey testified that NCNB did not refund to Alpha any interest or loan origination fees, and did not calculate any such refunds in the payoff amounts. *See* Cathey Dep. at 109. It is settled, however, that "[i]n general, Texas courts recognize the validity of usury savings clauses and enforce those clauses to defeat claims of usury." *FDIC v. Claycomb*, 945 F.2d 853, 860 (5th Cir.1991) (footnote omitted). To determine the effect of a usury savings clause, the court must consider the terms of the clause as a whole in light of the circumstances surrounding the transaction, and give effect to the objective intention of the parties as reflected by the written documents associated with the transaction. *Id.* Moreover, the court must presume that the parties intended to obey the law unless a contrary intention clearly manifests itself. *Id.* "The court must, if reasonably possible, give effect to the savings clause and interpret the savings clause so as to deny the right to

usurious interest." *Id.* (footnote omitted). In *Claycomb* the Fifth Circuit affirmed the district court's conclusion that usury savings clauses set forth in the loan documents defeated a usury claim. *Id.* (citing *Woodcrest Assocs., Ltd. v. Commonwealth Mtg. Corp.*, 775 S.W.2d 434, 439 (Tex.App.1989, writ denied)). The usury savings clauses in the notes at issue in *Claycomb*, 945 F.2d at 860 n. 24, are similar to ¶ 18. Paragraph 18 of the Fifth Modification evinces the intent of NCNB and Alpha that NCNB would not under any circumstances—including, but not limited to, prepayment, default, demand for payment, or acceleration of the maturity of any obligations or any part thereof—contract for, charge, or receive under the Note or otherwise exceed the maximum interest permitted by law. Under the controlling jurisprudence, the court is to presume that NCNB and Alpha intended to obey the law. *Claycomb*, 945 F.2d at 860. Accordingly, Alpha's usury claim is barred as a matter of law, and is dismissed with prejudice.

### B

■ NCNB next contends it cannot be held liable for breach of contract. It argues that (1) no breach occurred because the IFB loan commitment did not obligate the bank to provide financing for 15 years, but instead provided that the loan would be reviewed

ty liable with respect to any indebtedness under the Loan Documents) are hereby limited by the provisions of this paragraph which shall override and control all such agreements, whether now existing or hereafter arising and whether written or oral. In no way, nor in any event or contingency (including but not limited to prepayment, default, demand for payment, or acceleration of the maturity of any Obligations or any part thereof), shall the interest contracted for, charged or received under the Note or otherwise exceed the maximum amount permissible under applicable law. If, from any possible construction of any document, interest would otherwise be payable to Lender in excess of the maximum lawful amount, any such construction shall be subject to the provisions of this paragraph and such document shall be automatically reformed and the interest payable to Lender shall be automatically reduced to the maximum amount permitted under applicable law, without the necessity of execution of any amendment or new document. If Lender shall ever receive anything of value which is characterized as interest under applicable law and which would

apart from this provision be in excess of the maximum lawful amount, an amount equal to the amount which would have been excessive interest shall, without penalty, be applied to the reduction of the principal amount owing in the inverse order of its maturity and not to the payment of interest, or refunded to Borrower to the extent that the amount which would have been excessive interest exceeds unpaid principal. The right to accelerate maturity of the Note or any other indebtedness does not include the right to accelerate any interest which has not otherwise accrued on the date of such acceleration, and Lender does not intend to charge or receive any unearned interest in the event of acceleration. All interest paid or agreed to be paid to Lender shall, to the extend permitted by applicable law, be amortized, prorated, allocated and spread throughout the full stated term (including any renewal or extension) of such indebtedness so that the amount of interest on account of such indebtedness does not exceed the maximum permitted by applicable law.
Cathey Aff.Ex. A–8 at 8–9.

every three years; (2) Alpha cannot meet the elements of 12 U.S.C. § 1821(n)(4)(I); (3) the merger doctrine bars consideration of the alleged loan agreement; and (4) the terms of the Note control the conflicting terms of the alleged loan commitment.

### 1

NCNB's contention that the loan commitment should not be read to obligate IFB to provide financing for 15 years, but should be interpreted only to mean that the bank would evaluate triennially whether to continue to lending relationship, is baseless. The commitment provides, in pertinent part:

> The purpose of this letter is to evidence the commitment of Interfirst to carry the Permanent Financing on the land and office building reflected on said Deed of Trust Note for a term of 15 years. The Joint Venture and Interfirst agree that the loan ($700,000.00) will be reviewed every three years during such term and the interest rate for the remaining balance owing shall be negotiated between the parties at each three year period.

Cathey Aff.Ex. F. It reflects the intent of the parties that IFB would "carry the Permanent Financing ... for a term of 15 years," and that the Note would be reviewed every third year so that the interest rate for the remaining balance could be renegotiated. NCNB is not entitled to summary judgment on this ground.

**5.** 12 U.S.C. § 1821(n)(4)(I):

[N]o agreement which tends to diminish or defeat the right, title or interest of a bridge bank in any asset of an insured bank in default acquired by it shall be valid against the bridge bank unless such agreement—
(i) is in writing,
(ii) was executed by such insured bank in default and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by such insured bank in default,
(iii) was approved by the board of directors of such insured bank in default or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
(iv) has been, continuously from the time of its execution, an official record of such insured bank in default[.]

### 2

NCNB maintains next that it cannot be held liable for breach of contract because Alpha cannot meet the requirements of 12 U.S.C. § 1821(n)(4)(I).[5] NCNB contends there is no evidence in the minutes of the IFB loan committee or board of directors that either body approved the loan commitment between Alpha and IFB.

Although Alpha raises a number of objections to NCNB's reliance on § 1821(n)(4)(I), it does not challenge NCNB's attempt to apply this provision of FIRREA retroactively. The court has consistently declined to do so when FIRREA's application will impinge upon vested rights.[6] The Fifth Circuit has in the past avoided this issue on the ground that the same result would be reached under a pre-FIRREA application of the common law *D'Oench, Duhme*[7] doctrine and/or 12 U.S.C. § 1823(e). *See RTC v. Camp*, 965 F.2d 25, 30–31 (5th Cir.1992); *Kilpatrick v. Riddle*, 907 F.2d 1523, 1526 n. 4 (5th Cir. 1990), *cert. denied*, 498 U.S. 1083, 111 S.Ct. 954, 112 L.Ed.2d 1042 (1991). The court holds today that FIRREA should not control this aspect of a transaction that was completed approximately six years prior to its effective date. Alpha had no incentive in 1983 to ensure that IFB was complying with the details of a statute not then in existence.

The question therefore becomes whether NCNB is entitled to summary judgment pursuant to § 1823(e)[8]—the pre-FIR-

**6.** *See, e.g., Bank One, Tex., N.A. v. Prudential Ins. Co.*, 878 F.Supp. 943, 947 n. 1 (N.D.Tex.1995); *Irving Indep. Sch. Dist. v. Packard Props., Ltd.*, 762 F.Supp. 699, 703–04 (N.D.Tex.1991), *aff'd*, 970 F.2d 58 (5th Cir.1992); *Senior Unsecured Creditors' Comm. v. FDIC*, 749 F.Supp. 758, 773–74 (N.D.Tex.1990).

**7.** *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942).

**8.** 12 U.S.C. § 1823(e):

No agreement which tends to diminish or defeat the right, title or interest of the [FDIC] in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the [FDIC] unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereun-

REA statute—or to *D'Oench, Duhme*. Prior to enactment of FIRREA, § 1823(e) applied only to the FDIC in its corporate capacity. *See, e.g., Beighley v. FDIC*, 868 F.2d 776, 783 (5th Cir.1989). FIRREA extended the standards of § 1823(e) to bridge banks when § 1821(n)(4)(I) was enacted. *Thigpen v. Sparks*, 983 F.2d 644, 647–48 n. 5 (5th Cir. 1993) ("The pre-FIRREA version of § 1823(e) protected only FDIC in its corporate capacity, but FIRREA extended that protection ... to bridge banks[.]"). Accordingly, NCNB cannot rely on § 1823(e) to nullify the loan commitment.

■ This does not necessarily end the matter, however. Section 1823(e)'s common law counterpart, *D'Oench, Duhme*, which has often been termed in this and other circuits as the doctrine that § 1823(e) codified, was held pre-FIRREA to apply to bridge banks. *See Bell & Murphy & Assocs., Inc. v. Interfirst Bank Gateway, N.A.*, 894 F.2d 750, 754 (5th Cir.) (extending *D'Oench, Duhme* to NCNB, as a bridge bank), *cert. denied*, 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990); *Fair v. NCNB Tex. Nat'l Bank*, 733 F.Supp. 1099, 1102–03 (N.D.Tex.1990) (same). Numerous decisions of the Fifth and other circuits, and of this court, have interpreted and applied § 1823(e) and *D'Oench, Duhme* in tandem. In *RTC v. Camp*, for example, the panel held that a defense that failed under § 1823(e) was barred by *D'Oench, Duhme*. *RTC v. Camp*, 965 F.2d at 30–31.

■ It is not clear, however, that the reverse is uniformly true, that is, that a defense or claim *not* barred by § 1823(e) is nevertheless precluded by *D'Oench, Duhme*. In the present case, NCNB is not relying upon the archetypical "undisclosed side agreement" to invalidate the loan commitment as an encumbrance on the Note. Indeed, NCNB does not dispute that the loan commitment itself was part of IFB's files. What NCNB contends is missing are the required notations in the board and committee minutes. The common law *D'Oench,*

*Duhme* doctrine does not require recordation of these particular approvals. They are a creature of § 1823(e).

The court is hesitant to venture into resolution of the issues presented by this question, particularly where the parties have not briefed it and where NCNB has explicitly disavowed any intent to rely on *D'Oench, Duhme*. *See* D.Rep.Br. at 8. Therefore, the court holds for the present that § 1821(n)(4)(I) is unavailable to NCNB in this case; that § 1823(e) does not apply; and that NCNB has not shown a basis to rely on the common law doctrine of *D'Oench, Duhme*. The court therefore denies summary judgment on this ground.

### 3

■ NCNB next seeks summary judgment on the ground that the merger doctrine bars the breach of contract claim. It argues that the loan commitment was superseded by subsequent conflicting contracts. In other words, the loan commitment provided for a 15–year commitment, but the modifications specified that payment was due on a particular date or upon demand. NCNB argues pursuant to the merger doctrine that the loan commitment was extinguished. The court disagrees.

■ If the court can harmonize the commitment and Notes, it must do so, because the commitment and original Note were part of a single transaction. *Meisler v. Republic of Tex. Sav. Ass'n.*, 758 S.W.2d 878, 884 (Tex.App.1988, no writ); *Martin v. First Republic Bank*, 799 S.W.2d 482, 486 (Tex.App. 1990, writ denied). In the present case, the fact that the parties entered into Notes that matured in fewer than three-year intervals does not contradict the 15–year obligation to provide permanent financing. These actions can be harmonized on the basis that the parties renegotiated terms more frequently than the commitment required, but did not intend that the bank's commitment to provide permanent financing during a 15–year time span would be excused. In sum, the modifications and the loan commitment are

---

der, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee,

which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.

not so inconsistent that they cannot subsist together.

### 4

■ Finally, NCNB argues that the terms of the Note control the terms of the loan commitment. The court once again disagrees. This assertion is predicated on the theory that the Note's February 25, 1986 maturity date conflicts with the commitment's 15–year time period. It does not. For the reasons explained *supra* at § II(B)(3), the court holds the Note and commitment can be harmonized. NCNB is not entitled to summary judgment on Alpha's breach of contract claim.

### C

The court now considers Alpha's claim for tortious interference with business relations. Alpha maintains NCNB's decision not to renew the Alpha loan interfered with the contractual relationships of the individual members of the joint venture. NCNB seeks summary judgment on the ground of privilege, and argues (for reasons adopted from its analysis of Alpha's negligent misrepresentation claim) that this cause of action is barred by limitations.

### 1

As an initial proposition, the court observes that Alpha's tortious interference theory is pleaded ambiguously, and that it is difficult to discern the basis for the claim.

In its second amended complaint, Alpha alleges that NCNB tortiously interfered with "business relationships" between Alpha and third parties. *See* P.2d Am.Compl. at ¶ 18. Yet it also appears to be alleging that NCNB interfered with particular contracts. *Id.* In fact, the evidence on which Alpha relies to support this claim relates entirely to existing contracts. *See* Aff. of Oscar Olchyk, et al. ("Olchyk") at 2.[9] Moreover, Alpha does not appear to be complaining of interference with

contracts to which *Alpha* was a party, but instead of contracts to which *its venturers* were parties. In sum, Alpha seems to allege that its members suffered in various ways as a result of NCNB's decision not to renew the Note. *See id.* Assuming Alpha has standing to sue for injuries to its venturers, this claim appears to be nothing more than an allegation of some type of consequential damages, not one for tortious interference.

■ Under Texas law, the elements of a claim for tortious interference with contract are: (1) a contract subject to interference; (2) the defendant's act of interference was willful and intentional; (3) the defendant's intentional act was a proximate cause of the plaintiff's damage; and (4) actual damage or loss occurred. *Personal Preference Video, Inc. v. Home Box Office, Inc.*, 986 F.2d 110, 111 (5th Cir.1993). To establish a claim for tortious interference with prospective business relations, Alpha must prove: (1) a reasonable probability that it would have gotten a contract; (2) malicious and intentional conduct by the defendant which aborted the prospective business relationship; and (3) actual harm to the plaintiff. *In re Burzynski*, 989 F.2d 733, 739 (5th Cir.1993) (per curiam) (on rehearing). Alpha has not alleged or adduced proof with respect to several of these elements, *see* P.2d Am.Compl. at ¶ 18; Olchyk Aff. at 2, and it is unclear from the record whether it can establish them. Nevertheless, because NCNB does not seek summary judgment on this basis, the court will turn to the arguments it presents in its motion.

### 2

■ The court will consider first NCNB's limitations argument. Texas law provides that a claim for tortious inference with business relations is governed by a two-year statute of limitations, *First Nat'l Bank v. Levine*, 721 S.W.2d 287, 289 (Tex.1986).

---

9. The affidavit states, in relevant part:

Each of us had to liquidate investments which were governed by contracts between each of the undersigned joint venturers and third parties to pay off this loan. The investments governed by the contracts in questions [sic] were a pension plan, various certificates of deposit,

and a contract under which one of the venture members was due payments concerning the sale of his former business. The actions of the bank caused each of us to lose and forego the benefits and profits to which we were entitled under these contracts with third parties.
Olchyk Aff. at 2.

An action for tortious interference with contract is also governed by a two-year statute. *Id.* at 289 (citing *Atomic Fuel Extraction Corp. v. Estate of Slick*, 386 S.W.2d 180, 191 (Tex.Civ.App.1964), *writ ref'd n.r.e. per curiam*, 403 S.W.2d 784 (Tex.1965)). For a suit to be timely under the statute, it must be brought within two years following the date the cause of action accrued. *Snyder v. Eanes Indep. Sch. Dist.*, 860 S.W.2d 692, 699 (Tex.App.1993, writ denied) (affirming summary judgment dismissing tortious interference with contract claim as time-barred). "With respect to tort actions generally, the limitations period begins to run at the time the duty owed to one person is breached by a wrongful act of another." *Id.* at 699. "Normally, the cause of action accrues when the plaintiff suffers injury." *Arabian Shield Dev. Co. v. Hunt*, 808 S.W.2d 577, 583 (Tex. App.1991, writ denied).

██ NCNB's limitations argument is based on the premise that Alpha's cause of action accrued prior to January 23, 1990, over two years before January 23, 1992, the date Alpha filed suit. According to NCNB, plaintiff's claim for negligent misrepresentation and, in turn, its tortious interference action,[10] is predicated on statements NCNB made to the joint venturers in September 1989, when it informed Alpha that it would have to pay the loan off immediately. Alpha responds that the limitations period did not end until August 1992 because NCNB's interference continued through August 1990, when it required Alpha to pay off the principal and interest on the loan. Alpha argues that its suit is not time-barred because it was filed within two years after the premature pay-off occurred, and the statute of limitations on a tortious interference claim begins to run when the tortious act has ceased.

Neither party has properly analyzed the limitations defense in the context of Alpha's specific claim. NCNB's reasoning assumes that Alpha suffered a legal injury merely because NCNB foretold that it would not renew the Note. This position overlooks that Alpha is complaining that NCNB's decision to call the loan prematurely resulted in interference with existing contracts (according to the summary judgment evidence) with third parties. *See* Olchyk Aff. at 2. The point at which Alpha suffered legal injury, under its theory of the case, is when the contracts were abrogated.

██ Alpha complains that NCNB's conduct occurred between February and August 1990. *See* P.Resp. at ¶ 24. Because the limitations defense is an affirmative defense under Texas law, NCNB has the burden of proof. *See Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 517 (Tex.1988). In order for the party with the burden of proof to obtain summary judgment, it must establish "beyond peradventure all of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). NCNB has not established that Alpha failed to file suit within two years of the date on which a contract (or prospective business relation) was interfered with. NCNB's analysis does not therefore warrant summary judgment.

This principle is illustrated by *Grinstead v. Katy Nat'l Bank*, 1989 WL 141232, *2 (Tex. App. Nov. 22, 1989, writ denied). In *Grinstead* the court of appeals addressed when a cause of action for tortious interference with contract accrued.[11] The trial court had granted summary judgment, holding the claim was barred by limitations. *Id.* at *1. Plaintiff's lawsuit was based on a bank's notification to a purchaser of the plaintiff's business assets that the bank held a lien on the assets. The purchaser sent the plaintiff a letter on October 25, 1985 seeking to rescind the contract, and thereafter sued the plaintiff. *Id.* The court noted that "the test for determining when the limitations period begins to run, is whether the act causing the damage does or does not constitute legal injury." *Id.* at *2. The court held the plaintiff's cause of action accrued on October 25, when he was notified of the purchaser's in-

---

**10.** *See* D.Br. at 16 (relying on negligent misrepresentation analysis to support tortious interference limitations defense).

**11.** The court recognizes that this opinion may not be cited as precedent. *See* Tex.R.App.P. 90. The court does not deem itself bound to follow the decision, but cites it only for its application of Texas law.

tention to rescind the contract based on information received by the bank regarding its security interest in the business assets. *Id.* at *2.[12] The court holds that NCNB is not entitled to summary judgment pursuant to its limitations defense.

On the other hand, Alpha's unqualified assertion that the statute of limitations on a tortious interference claim begins to run when the tortious act has ceased, its reliance on a continuing tort theory, and its citation to distinguishable cases,[13] also misses the mark. Nevertheless, for the reasons set out above, assuming *arguendo* Alpha has a valid claim for tortious interference, it has based the claim on injuries incurred during the period February 1990 to August 1990 by reason of lost contracts or prospective contracts. It suffered legal injuries on those occasions and thereby accrued causes of action. Because Alpha brought suit on January 23, 1992, all such claims fall within the limitations period.

### 3

■ NCNB's privilege argument is easily dispatched at this point. Because NCNB arguably was obligated pursuant to the loan commitment to continue permanent financing of Alpha's land and building, it could not, as a matter of law, have acted on the basis of privilege. This is not to say, of course, that NCNB cannot prevail at trial on this defense, but it is not entitled to summary judgment as a matter of law on this ground.

**12.** For reasons not pertinent here, the court of appeals reversed the summary judgment.

**13.** Alpha cites *Arquette v. Hancock*, 656 S.W.2d 627 (Tex.App.1983, writ ref'd n.r.e.), and *Twyman v. Twyman*, 790 S.W.2d 819 (Tex.App.1990, no writ). Neither case addresses whether, as a matter of law, a claim for tortious interference commences when the interference ceases. *Arquette* was an action filed pursuant to 42 U.S.C. § 1983 alleging a civil rights violation. *Arquette*, 656 S.W.2d at 628. The applicable statute of limitations was governed by state law, but the determination of when the cause of action accrued was governed by federal law. *Id.* at 629. The court held the cause of action for a Fifth Amendment taking claim accrued when the plaintiff knew or had reason to know of his injury, which was the collection of a fine. *Id.* The plaintiff alleged that defendant's refusal to refund the fine was a continuing violation. The court discussed the distinction between a continuous tort, which involves wrongful conduct that is repeated until desisted, and other types of

### D

■ NCNB moves for summary judgment dismissing Alpha's negligent misrepresentation claim, contending the claim is time-barred and that a promise of future conduct is not actionable. An analysis of the limitations argument implicitly shows the invalidity of the merits of Alpha's claim, because it demonstrates the difficulty of determining when the cause of action for misrepresentation of a future promise actually accrues. Nevertheless, the court will not resolve this claim on the basis of the limitations defense; the court will dismiss the claim because it lacks substance.

■ Under Texas law, the elements of a claim for negligent misrepresentation are: (1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation. *Federal Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991). "Significantly, the sort of 'false information' contemplated in a negligent misrepresentation case is a misstatement of *existing*

claims. *Id.* The court rejected the contention that the plaintiff's injury was continuous. The wrongful act inherent in plaintiff's § 1983 claim was the exacting of a fine at a time not authorized by law. *Id.* at 629–30. The cause of action accrued when the fine was paid, and was not a continuing injury. *Id.* at 630.

In *Twyman* the court also addressed continuing tort jurisprudence in the context of a claim for negligent infliction of emotional distress. *Twyman*, 790 S.W.2d at 819. The trial court rejected defendant's limitation defense on the ground that the tort was a continuing one. *Id.* at 820. The court of appeals agreed, holding that defendant's actions amounted to a continuing course of conduct. *Id.* at 821.

Although both *Arquette* and *Twyman* recognize the principle that a tort can be continuing in nature, and that in such a case limitations will not commence until the last act has occurred, it is also apparent that the court must focus on the nature of the tort itself.

*fact."* *Airborne Freight Corp. v. C.R. Lee Enters., Inc.,* 847 S.W.2d 289, 294 (Tex.App. 1992, writ denied). Alpha argues there is a material fact issue concerning whether NCNB's representation related to future conduct. In its summary judgment response, it cites the court to two depositions, *see* P.Resp. at ¶ 26, as well as the venturers' joint affidavit, *id.* The court has read the cited portions of the depositions, and the affidavit. The testimony of J. Richard Whittington ("Whittington") is that A. Wayne Smith ("Smith"), a senior vice president at NCNB, represented that that loan would be extended at the end of six months. *See* Whittington Dep. at 45. Whittington had asked Smith about the possibility of obtaining additional financing under the commitment, and renewing the loan. *Id.* at 44. Smith told Whittington that due to the change in banks, he required some more authority. *Id.* at 45. Therefore, Alpha needed to extend the loan for six months (which ended up being four months). Smith stated that it was a "done deal" that *at the end of four months* the loan would be renewed. *Id.* This clearly is a representation concerning a future event, not an existing fact. Additionally, neither the cited portion of Don K. Zelezny's testimony, nor the affidavit, supports Alpha's argument.

Alpha posits that the Texas Supreme Court's opinion in *Sloane* supports the proposition that the tort of negligent misrepresentation can apply in the present case. *See* P.Resp. at ¶ 26. In *Sloane,* however, "the loan officer informed [the plaintiffs] that the bank's board *had approved the loan,* and that the [plaintiffs] could go ahead with site preparation work." *Sloane,* 825 S.W.2d at 441 (emphasis added). The plaintiffs based their negligent misrepresentation claim on the bank's representation that "the bank *had approved* their loan application." (Emphasis added). In the instant case, however, the bank officer stated that he would need additional authority, and that the bank's *future* performance was a "done deal." NCNB is entitled to summary judgment, and the negli-

gent misrepresentation claim is dismissed with prejudice.

### E

NCNB next urges that Alpha's wrongful acceleration claim must be dismissed because no acceleration occurred. Instead, the Note simply matured, was not renewed, and was paid in full. Alpha has made no effort to explain how an acceleration occurred under the facts of this case, and the claim is dismissed with prejudice.

### F

▅ Alpha alleges a cause of action for negligent spoliation of evidence. As relief, it seeks to recover damages and to benefit from a presumption that, but for NCNB's loss or destruction of the documents, the evidence would strengthen Alpha's claims and not be favorable to NCNB. *See* P.2d Am.Compl. at ¶ 19. NCNB moves for summary judgment, contending Texas does not recognize such a cause of action.

The best Alpha can do to support a claim for negligent spoliation is to rely on a Texas case that discussed the theory but neither accepted nor rejected it. *See Diehl v. Rocky Mountain Communications, Inc.,* 818 S.W.2d 183, 184 (Tex.App.1991, writ denied). This hardly supports the proposition that Texas recognizes such a claim. This federal court will not make new state law. Accordingly, the claim is dismissed as a cause of action.[14]

### G

▅ NCNB argues that it is entitled to summary judgment on the basis of its estoppel by contract defense. NCNB contends Alpha is estopped to pursue any claims against NCNB because in the Third, Fourth, and Fifth Modifications, Alpha represented that it had no claims against NCNB, and in the Third and Fourth Modifications NCNB acknowledged and represented that all claims had been compromised and settled.

---

**14.** The court does not decide, at this juncture, whether Alpha is entitled to an evidentiary pre-

sumption on the basis of spoliation.

The difficulty with NCNB's argument is that, insofar as relevant to Alpha's remaining claims that have not been dismissed today, Alpha appears to be relying on conduct that post-dated the modifications. It contends that *after* the Fifth Modification was entered into on January 24, 1990, NCNB failed to fulfill the loan commitment and to renew the Note. Alpha does not appear therefore to be alleging claims that are inconsistent with the statements made in the documents. In any event, NCNB has not established its estoppel defense as a matter of law and is not entitled to summary judgment as to the remaining claims on this basis.

\* \* \*

Accordingly, for the reasons set out, NCNB's motion for summary judgment is granted in part and denied in part.

**SO ORDERED.**