**L. N. CHILDRESS and Roger W. CRAMPTON, Appellants,**

v.

**E. A. COOK, Jr., Appellee.**

No. 16360.

United States Court of Appeals Fifth Circuit.

June 18, 1957.

Curtis E. Hill, E. L. Markham, Jr., Dallas, Tex., for appellant, L. N. Childress.

Brannan & Brannan, Wichita Falls, Tex., for appellant, Roger W. Crampton.

Kearby Peery, Peery & Wilson and Tom D. Glazner, Wichita Falls, Tex., for Appellee, E. A. Cook, Jr.

Before HUTCHESON, Chief Judge, and TUTTLE and JONES, Circuit Judges.

TUTTLE, Circuit Judge.

These are cross-appeals by both defendants from a judgment of the district court sitting without a jury, in which appellant Childress appeals from the entire judgment entered against him in favor of the plaintiff-appellee Cook and from as much of the judgment on a cross-claim as was entered against him in favor of Crampton, while appellant Crampton, defendant and cross-claimant below, appeals from only so much of the judgment as denies part of his cross-claim against Childress.

On August 1, 1955, Crampton entered into an agreement with certain owners of vacant real estate in downtown Wichita Falls, Texas, whereby he received an option to purchase the property for $415,000, provided he deposited $10,000 in earnest money in escrow with the First National Bank of Wichita Falls by 10:00 A.M. on August 3rd, this sum to be applied as part of the purchase price to be paid in whole on or before October 1st, or to be forfeited to the sellers if the transaction was not consummated by that time. Crampton thereupon executed a promissory note for $10,000 to the bank, on which he obtained the endorsement of his father-in-law, Cook, as surety, which note was to be used to obtain the sum required to be placed in escrow when the bank received further instructions from Crampton. He then entered into several lease agreements with three potential tenants of the building he planned to erect, who agreed to pay monthly rentals totalling at least $3,685 for a term of 15 years. At that point he was informed by a real estate agent that the latter had heard of a tentative offer of $10,000 for the entire deal as thus far developed.

On the morning of August 3rd Crampton visited Childress and entered into a written contract with him whereby the latter agreed to secure the necessary financing for the purchase of the property and the erection of the building, and to relieve Cook of any liability in connection with the above note, in return for a three-fourths interest in the property. The agreement in pertinent part reads as follows:

"That L. N. Childress will secure the necessary financing to erect a building on the premises suitable to satisfy the terms of the above leases, and particularly L. N. Childress will, within forty (40) days from this day, relieve E. A. Cook, Jr. from any and all liability on a certain note for Ten Thousand ($10,000.) Dollars held by the First National Bank of Wichita Falls, Texas, as security for an escrow deposit on the above contract sale, provided that the above described leases are executed by financially sound Lessees as represented by Roger W. Crampton."

Crampton thereupon instructed the bank to conclude the escrow arrangements in accordance with the agreement between him and the owners of the property. Childress suggested certain changes in the proposed building plans submitted to him by Crampton, which the latter completed by about August 17th, at the cost of $800 in architect's fees.

Childress never took any steps to relieve Cook from his liability on the $10,000 note, as the contract required him to do before September 13th, and he never secured the necessary financing to enable Crampton to comply with the terms of the purchase agreement, and consequently on October 1, 1955, the $10,000 earnest money was forfeited. Crampton being unable to honor the note, it was paid by Cook.

Cook, a citizen of Nebraska, thereupon brought a diversity suit in the

court below against Crampton and Childress, both citizens of Texas, for recovery of the $10,000. Crampton filed a cross-claim against his codefendant in which he alleged the latter's breach of the contract between them, and prayed that he should be required to pay (1) the entire amount of Cook's claim, as well as (2) damages to Crampton: $10,000 for the loss of the value of the leases, $800 for the architect's fees incurred in modifying the plans in accordance with Childress' demands, and lesser amounts for other incidental expenditures.

The court, after a trial without a jury, entered findings of fact that Childress had breached his contract with Crampton and that Crampton had breached his earlier agreement to indemnify Cook, in that neither had reimbursed the latter for the $10,000 he had been required to pay; that Childress had wrongfully breached his contract with Crampton without any fault on the latter's part; that the leases had a "reasonable cash market value" of $10,000 when the contract was entered into but that they became worthless when Crampton was unable to purchase the property; and that the $800 expense for the architect had been incurred at the instance of Childress who knew that if he breached his agreement Crampton would have to forfeit the $10,000 earnest money, lose the value of the leases, and lose the amount of the architect's fees. Judgment was entered for $10,000 with interest in favor of Cook against both defendants, with a proviso that Crampton should recover from Childress any part of the judgment that he paid to Cook, as well as $800 with interest. No reference is made either in the Conclusions of Law or in the judgment to the $10,000 Crampton claimed for the value of the leases.

On this appeal Childress' principal contention is that he never became liable to either Cook or Crampton on his contract with the latter, for there was no evidence of fulfillment of the alleged condition precedent:

"* * * provided that the above described leases are executed by financially sound Lessees as represented by Roger W. Crampton."

or at least that plaintiff did not carry his burden of proving the fulfillment of that condition and that the court erred in failing to admit and to consider parol testimony with respect to the meaning of the proviso. He also complains that the court erred in not finding that Crampton's delay in revising the building plans prevented the accrual of any obligation Childress had under the contract, for by the time the plans were ready it was too late for him to obtain the necessary financing from outsiders to whom the revised plans would have to be shown.

Considering first the latter objection it appears from Childress' testimony itself that at no time either before or after Crampton submitted, after some delay, the proposed building plans and brochures (all were certainly ready by September 1st) did Childress indicate that the delay in doing so made him unwilling or unable to proceed with his obligation under the agreement. As a matter of fact all indications were that he did intend to proceed with it, and thus he waived any possible breach on the part of Crampton and estopped himself from later rescinding the contract because of the alleged delay, for a timely disclaimer of Childress' rights and obligations under the contract might have enabled Crampton to make alternative arrangements to finance or sell the deal during the month of September or October, upon payment of an additional $1,000 to extend the option one month. The trial court found specifically that:

"The contract of August 3, 1955, between Childress and Crampton was wrongfully breached by Childress without any fault on the part of Crampton."

This finding is amply supported in the record and is certainly not "clearly erroneous," rule 52(a), Fed.Rules Civ. Proc., 28 U.S.C.A.

The first contention presents greater difficulties, for the trial court made no findings specifically relevant to this point, except perhaps for the conclusionary finding quoted above, nor did it indicate in what manner it construed the proviso. The evidence shows that as to the three leases there was testimony that the $2,600 per month agreement was made with a party said to be worth in excess of $300,000 who operated several other parking establishments; the $825 per month agreement was made with the Renfro Drug Company which operated a chain of apparently solvent drug stores; the $260 per month lease was made with a party who owned two other shoe stores in town, had cash assets of about $6–7,000, an approximate net worth of about $30,000, a Dun & Bradstreet rating of E-2, and who testified that he considered himself financially able to carry out the terms of the lease. The court in informally summarizing the contentions of the parties as to this point said:

> " * * * the evidence here makes a fairly strong case for the view that these leases were good leases, and certainly one or two of them appear to be very solid leases, backed up by much business experience and strong assets and good business reputation.
>
> "I don't really see how there could be convincing contention that these leases were flimsy and unstable as far as financial reliance is concerned."

The record would thus certainly support an implied finding that the leases were executed by "financially sound lessees." Childress, however, contends that the words "as represented by Roger W. Crampton" modify the phrase to mean a much higher standard of financial responsibility than would ordinarily be implied by it. Childress testified that Crampton had told him that all these were "blue chip leases"; Crampton testified that he had not made any such guarantee and that the modifying phrase had been included at *his* insistence only to show that he had indicated to Childress that he had made no thorough investigation of the lessees' credit standing and would therefore be unable to guarantee that they were in fact responsible, but only that he had not misrepresented their responsibility. The trial court did listen to much oral testimony about the circumstances of the execution of the Childress-Crampton agreement that would shed light on the construction of this phrase; its informal remarks in closing [1] state only the undisputed rule that this testimony could not alter the plain meaning of the writing. The explicit finding that Childress "wrongfully breached" his contract indicates that the court rejected the contention that lessees' financial responsibility was other than the evidence at the trial showed Crampton had claimed it to be; this finding too is not clearly erroneous.

We now proceed to a consideration of the cross-claim. On the threshold we face a jurisdictional question which was neither raised nor considered below, nor referred to in the original briefs on appeal, but which we must nevertheless notice and decide. Both Crampton and Childress, the only parties to the cross-action, are citizens of Texas; there is thus no diversity nor any other direct ground of federal jurisdiction as to any controversies between them. However, in this complaint the cross-claimant asserts:

> I do think that so far as the written memorandum goes, that it is immune to alteration and amendment by parole and that any fragment of understanding between the parties that could have endured would have to be something apart from the writing and not in any way inconsistent with it, but merely an addition to it."

---

1. "Now, counsel for defendant have the uphill position in my mind as between the plaintiff and the defendant. You have been striking here in the testimony at an effort of trying to chip away the written memorandum, and of course I have no doubt that there were a good many things said there in the conversations between these parties that were not preserved in the written memorandum, but

"This action is ancillary to the subject matter of the litigation in the above styled and numbered cause; wherefore, the court has jurisdiction of this cross-action and claim."

It is apparent that the procedural basis for the cross-action is rule 13(g)[2] since it involves both a "claim by one party against a co-party arising out of the transaction * * * that is the subject matter * * * of the original action" and it also includes "a claim that the party against whom it is asserted is or may be liable to the cross-claimant for all or part of a claim asserted in the action against the cross-claimant."

Since the adoption of the Federal Rules it has been suggested that whenever the rules permit the filing of a cross-claim under rule 13(g) it is by definition "ancillary" to the principal action and thus, under long established principles,[3] needs no independent jurisdictional grounds to permit its litigation in federal court.[4] However, since rule 82 forbids the *construction* of any rule so

as to extend the jurisdiction of the district courts,[5] it is asserted that rule 13 (g) merely codifies part of and does not extend beyond the historical extent of the rule of "ancillary jurisdiction" which had always been latent in the federal courts even though the former more restrictive rules of pleading had generally made the joint litigation even of "ancillary" suits impossible.[6] Naturally this is true only if it appears that claims that may now be pleaded under the "transaction or occurrence" test of rule 13(g) are "ancillary" in the same and in no broader sense than the concept of "ancillary" that had been developed as the basis of dependent jurisdiction. The two principal textual authorities (see footnote 4, supra) assert that this is so; Moore in particular suggests that this Circuit is the only one that maintains a contrary interpretation.[7]

We do not believe, however, that the jurisdictional rule in this Circuit is any more restrictive than that accepted by the other courts of appeals. The case of Galveston, Harrisburg & San Antonio

---

2. "Rule 13. Counterclaim and Cross-Claim

&ast;   &ast;   &ast;   &ast;   &ast;

"(g) Cross-Claim Against Co-Party. A pleading may state as a cross-claim any claim by one party against a co-party arising out of the transaction or occurrence that is the subject matter either of the original action or of a counterclaim therein or relating to any property that is the subject matter of the original action. Such cross-claim may include a claim that the party against whom it is asserted is or may be liable to the cross-claimant for all or part of a claim asserted in the action against the cross-claimant. As amended Dec. 27, 1946, effective March 19, 1948."
Fed.Rules Civ.Proc. rule 13(g), 28 U.S. C.A.

3. See, e. g., Mitchell v. Maurer, 293 U.S. 237, 55 S.Ct. 162, 79 L.Ed. 338; Local Loan Co. v. Hunt, 292 U.S. 234, 54 S. Ct. 695, 78 L.Ed. 1230; Fulton National Bank of Atlanta v. Hozier, 267 U.S. 276, 45 S.Ct. 261, 69 L.Ed. 609; 1 Barron & Holtzoff, Federal Practice and Procedure § 23, at 43 fn. 21.

4. 3 Moore, Federal Practice ¶13.36; 1 Barron & Holtzoff, Federal Practice and Procedure § 392, at 781, 786. See also cases discussed or cited below.

5. "Rule 82. Jurisdiction and Venue Unaffected

"These rules shall not be construed to extend or limit the jurisdiction of the United States district courts or the venue of actions therein. As amended Dec. 29, 1948, effective Oct. 20, 1949."

6. See discussion of this point in Hoosier Cas. Co. of Indianapolis, Ind. v. Fox, D.C.N.D.Iowa, 102 F.Supp. 214, 225–227.

7. "Cross-claims, like all cross-bills, and like compulsory counterclaims are considered as auxiliary or ancillary to the principal claim to which they are related, and the jurisdiction which supports that claim will support the cross-claim,[1] at least where the original action was not brought collusively to give the federal court jurisdiction over the cross-claim.

"1 * * * The Fifth Circuit, however, inclines to the view that unless the cross-bill concerns the disposition of a res before the court there must be independent jurisdictional grounds to support it. See Galveston, Harrisburg & San Antonio Ry. Co. v. Hall (5 Cir., 1934), 70 F.2d 608, 610, discussing Republic Nat. Bank & T. Co. v. Massachusetts B. & Ins. Co. (5 Cir., 1934), 68 F.2d 445." 3 Moore, Federal Practice ¶13.36 at 97.

Ry. v. Hall, 5 Cir., 70 F.2d 608, in which Moore claims to find a statement of our rule, is, of course, not directly pertinent, since it held merely that in spite of the rule permitting impleader of parties, a defendant in a federal-question tort suit brought by a co-citizen could not implead another co-citizen against whom he could assert only a state created contractual cause of action: "The two controversies here are wholly distinct in parties and subject-matter." 70 F.2d at page 610. The case of Republic National Bank & Trust Co. v. Massachusetts Bonding & Ins. Co., 5 Cir., 68 F.2d 445, which it cites, held that where a surety brings an equitable action in diversity against the obligee and against the contractor's assignee for payments improperly made to the latter or retained by the former, and also interpleads all other claimants against the contractor and his bond, and these claimants file cross-claims against the original defendants, their co-citizens, the court had jurisdiction over the cross-claims only insofar as necessary to administer the "fund" created by the principal suit; other cross-claims, being of a legal nature, could not be joined in the equitable action [8] and, lacking independent grounds for federal jurisdiction, had to be dismissed. No such considerations are applicable here since all aspects of the original action and of the cross-claim are "legal," and in any case, all restrictions on the joinder of legal and equitable actions have been abolished by the Federal Rules of Civil Procedure.[9]

In any case this Court, in McComb v. McCormack, 5 Cir., 159 F.2d 219, 226, has already specifically approved the jurisdictional rule as stated in Moore's treatise, with a footnote reference indicating that the possible applicability of the Galveston Ry. and Republic National Bank cases had been considered.[10]

---

8. The only relaxation of the former strict separation of legal from equitable actions permitted by the 1912 Equity Rules, then in effect, was that a compulsory legal *counterclaim* could be pleaded in an equitable action. See Equity Rule 30, 226 U.S. 627, 657.

9. Rules 2, 18, Fed.Rules, Civ.Proc., 28 U.S. C.A. That such a broadened rule of pleading, which may have the incidental effect of giving a federal court dependent jurisdiction over a controversy not otherwise cognizable by the court, is not an impermissible extension of jurisdiction by rule of court (now forbidden specifically by Rule 82, but even formerly proscribed, Washington-Southern Navigation Co. v. Baltimore & Phila. Steamboat Co., 263 U.S. 629, 635–636, 44 S.Ct. 220, 68 L.Ed. 480), see Moore v. New York Cotton Exchange, 270 U.S. 593, 609, 46 S.Ct. 367, 70 L.Ed. 750, in which the then still new Equity Rule 30 was held to give a federal district court jurisdiction over a counterclaim resting on no independent federal jurisdictional ground.

10. See also the following cases in other circuits in which jurisdiction over otherwise non-cognizable cross-claims has been upheld by virtue of Rule 13(g), or of its predecessor, Equity Rule 30: Mathis v. Ligon, 10 Cir., 39 F.2d 455, certiorari denied, 282 U.S. 846, 51 S.Ct. 26, 75 L. Ed. 751; Queenan v. Mays, 10 Cir., 90 F.2d 525, certiorari denied Board of Com'rs of Creek County, Okl. v. Mays, 302 U.S. 724, 58 S.Ct. 45, 82 L.Ed. 559; Connecticut Indemnity Co. v. Lee, 1 Cir., 168 F.2d 420; Collier v. Harvey, 10 Cir., 179 F.2d 664 (note, however, the proviso in the remand order); Coastal Air Lines, Inc., v. Dockery, 8 Cir., 180 F.2d 874; Glens Falls Indemnity Co. v. United States, 9 Cir., 229 F.2d 370. But see contra, Magnolia Petroleum Co. v. Suits, 10 Cir., 40 F.2d 161; Pettyjohn v. Pettyjohn, 8 Cir., 192 F.2d 322. A number of district courts have perhaps broadened the concept of "ancillary" jurisdiction even further than most of the Courts of Appeals have done; see, e. g. Everett v. Independent School District of Rock Rapids, C.C.N.D.Iowa, 102 F. 529; Federal Mining & Smelting Co. v. Bunker Hill & Sullivan Mining & Concentrating Co., C.C.D.Idaho, 187 F. 474; Carter Oil Co. v. Wood, D.C.E.D.Ill., 30 F.Supp. 875 (though this case involved merely conflicting claims to particular property); United States, for Use and Benefit of Jones Contracting Co. v. Skilken, D.C. N.D.Ohio, 53 F.Supp. 14 (and cases there cited); Hoosier Casualty Co. of Indianapolis v. Fox, D.C.N.D.Iowa, 102 F. Supp. 214 (dicta) (and cases there cited); Southwest Lime Co. v. Lindley, D.C.W.D. Ark., 12 F.R.D. 484; see also Gish Realty Co. v. Central City, Ky., 260 S.W.2d 946.

The cross-claim that, in the nature of an impleader, prays that Childress be held liable over to Crampton for any amount the latter pays to Cook on the judgment is also supportable on the additional jurisdictional ground that historically the federal courts have had jurisdiction to determine ancillary matters in order to prevent the principal decree from working an injustice. Rickey Land & Cattle Co. v. Miller & Lux, 218 U.S. 258, 263, 31 S.Ct. 11, 54 L.Ed. 1032.

■ We hold that the district court had jurisdiction to try both types of cross-claims here asserted by Crampton against Childress, and we therefore proceed to review the decisions on the merits.

■ In view of the findings of the trial court, discussed and approved above, it is clear that Childress should be held liable over to Crampton for any amount that the latter pays to Cook on the judgment. If Childress had fully performed his contractual obligations to Crampton then the necessary financing for the purchase of the real estate would have been secured and the earnest money held in escrow would not have been forfeited; even more pertinently, Childress had obligated himself to relieve Cook from any liability on the note, and had he done so there would have been no occasion for Cook to assert any claim against Crampton. The trial court was entirely correct in holding Childress liable over to Crampton.

■ On the findings of the trial court, which are supported by the evidence, we must also sustain the judgment against Childress for the $800 architect's fees, since this expense was incurred by Crampton at Childress' instance, in pursuance of the contract that the latter breached, and, as the trial court found, this breach was calculated to and did make the expenditure worthless to Crampton.

We come finally to Crampton's claim that Childress is obligated to reimburse him for the value of the leases that Crampton had negotiated and which be-

came worthless when the principal deal fell through. The trial court made the following pertinent findings:

"III.

"The leases mentioned in said contract at that time had a reasonable cash market value of $10,000 and said value continued until the time when the contract was breached by Childress.

"IV.

"The breach of said contract rendered the value of the leases immediately problematical, and said leases became worthless when Crampton was unable to conclude his contingent purchase contract with the Morgan heirs.

"V.

"The defendant Childress knew at the time he entered into the said contract that if the option from the Morgan heirs expired Crampton would lose * * * the value of the leases * * *."

yet concluded:

"III.

"The other relief sought by defendant Crampton [including reimbursement for the value of the leases] against the defendant Childress is denied."

No attack is made on the above *findings*, and we ourselves have concluded that they are sufficiently supported by the record. The only argument that Childress offers in support of the trial court's conclusion of no liability is that the "loss of leases and other items sued for are too remote and speculative because there were too many 'ifs' in the chain of causation." Denial of recovery is assertedly supported by the citation of two non-Texas cases, Cain v. Vollmer, 19 Idaho 163, 112 P. 686, 32 L.R.A.,N.S., 38, and Western Union Tel. Co. v. Trinidad Bean & Elev. Co., 84 Colo. 93, 267 P. 1068, in each of which, as Childress himself points out, there were too many iffy contingencies.

■ Here, however, the damages sued for are not particularly conjectural or

speculative. Crampton had been informed of a tentative offer of $10,000 for the deal as it stood before he made the agreement with Childress, and at the trial a real estate man testified that on August 3, 1955, the "reasonable cash market value" of the leases had been between ten and twenty thousand dollars. This evidence indicates that at least the $10,000 figure was sufficiently certain to support a recovery. It is also clear that the value of the leases, as well as the probable destruction of that value in the event of Childress' failure to perform, was within the contemplation of the parties at the time they made their contract. Thus recovery should be allowed. Cf. Cotherman v. Oriental Oil Co., Tex.Civ. App., 272 S.W. 616, 622; McGuire v. Osage Oil Corp., Tex.Com.App., 55 S.W. 2d 535 (dicta); Logan v. Elliott, Tex. Civ.App., 61 S.W.2d 157, 159; 13 Tex. Jur., Damages §§ 16–17.

■ Though properly speaking this is not a suit for the recovery of future profits but for the destruction of existing market value, we note that Texas law permits damages even for the former type of loss, whether the profits are expected from the actual contract breached or from a collateral agreement, though in the latter case there must be some showing—here explicitly found—that these expected profits were within defendant's contemplation. See San Antonio Paper Co. v. Morgan, Tex.Civ.App., 53 S.W.2d 651; Morgan v. Young, Tex.Civ.App., 203 S.W.2d 837, 853; 13 Tex.Jur. Damages §§ 17, 105–13, 242, 274.

On the basis of the trial court's adequately supported findings there is no reason to deny Crampton his recovery for the $10,000 lost value of the leases. Irwin v. Cook, 24 Tex. 244; cf. Coppedge v. Kreuz, Tex.Civ.App., 2 S.W.2d 362.

The judgment of the district court is reversed as to the denial of the recovery by Crampton from Childress of the loss in value of the leases, and is affirmed in all other respects. The case is remanded to the trial court with directions to enter judgment in favor of Crampton consistent with this opinion.

HUTCHESON, Chief Judge (concurring in part and dissenting in part).

For the reasons well stated in the opinion, I concur in the affirmance of the judgment on Childress's appeal.

As to Crampton's appeal from the denial of his cross-action, while because of the inadequate manner in which the issues tendered by it were tried, I would not oppose a reversal of the judgment with a remand for trial anew, I must dissent from the opinion that the judgment should be reversed and a judgment here entered for Crampton for $10,000. I do this because I am of the clear opinion that, upon the record made below, including the views of the district judge [1] stated from the bench at the conclusion of the testimony, and the findings and conclusions filed by him on which his judgment denying the cross-action was based, there is no warrant for the entry by us of the proposed judgment.

1. The Court: "All right, everybody closes. Now, I will not take time to review in any particularity the present impressions I have about the case because sometimes such impressions are premature, but I will say to counsel that as I see it as of this moment, *if the cross-claimant is entitled to any recovery against the defendant, he and his counsel have the uphill position, in my mind, so far as concerns the value of the leases, or, in other words, the $10,000 figure.* I think that his counsel should analyze that item carefully and present any argument you may have about it. *It just seems*

*pretty plain from the testimony of the real estate man here that that value didn't relate to those leases as separate articles of commerce at all, but related to them only as tied in with this project and I don't know what assurance there is here that this deal could ever have been placed, no matter how diligent the defendant might have been.*

"Therefore, it seems to me that that item of damages might well be too remote and speculative for consideration here. I am not ruling on it; I am just saying that's why counsel has the uphill position in mind." Emphasis supplied.