**A. O. SMITH CORPORATION, Plaintiff,**

v.

**S. W. APPLEWHITE II, et ux., et al.,
Defendants and Counter-plaintiffs,**

v.

**A. O. SMITH CORPORATION and H. L.
Peterson Co., Counter-defendants.**

**Civ. A. No. 2914.**

United States District Court
S. D. Texas,
Galveston Division.

March 26, 1965.

Supplemental Opinion July 30, 1965.

Vinson, Elkins, Weems & Searls, Houston, Tex., James Greenwood, III, Houston, Tex., for plaintiff and counter-defendant A. O. Smith Corp.

Baker, Botts, Shepherd & Coates, Houston, Tex., Walter Workman, Houston, Tex., for defendants and counter-plaintiffs.

Spafford, Freedman, Hamlin, Gay & Whitham, Cedric G. Hamlin, Dallas, Tex., for counter-defendant H. L. Peterson Co.

MEMORANDUM OPINION:

NOEL, District Judge:

Plaintiff A. O. Smith Corporation, hereinafter called "A. O. Smith," filed this action on August 21, 1962, as alleged owner and holder in due course of a promissory note and chattel mortgage executed by defendants S. W. Applewhite, II, S. W. Applewhite, III, and their wives, hereinafter sometimes called "Applewhites," on January 5, 1960. The Applewhites have been in default on the note since December 1960. The Applewhites filed a counterclaim in this action against A. O. Smith and counter-defendant H. L. Peterson Company on June 14, 1963. Furthermore, they had filed in state court, prior to the filing of A. O. Smith's original complaint in this Court, an action against A. O. Smith and others seeking damages and rescission of the promissory note and chattel mortgage.

This cause was tried before the Court without jury and is now ripe for resolution.

As of December 1959, the Applewhites were doing business as Applewhite Dairy in Austin County, Texas. The dairy was milking approximately 45 to 50 cows and had a dairy base of approximately 15,500 pounds.

In the latter part of 1959, counter-defendant H. L. Peterson Company, acting by and through Hugh Peterson, solicited from the Applewhites an order for the purchase of an A. O. Smith Harvestore and attachments to be used in accordance with the A. O. Smith vertical farming program. On December 14, 1959, the Applewhites executed the solicited purchase order, which gave rise to the promissory note and chattel mortgage in question.

Prior to the execution of and as an inducement to execute the purchase order, Hugh Peterson, on behalf of H. L. Peterson Company, made to the Applewhites the following false representations of material facts:

(1) That use of the Harvestore and the vertical feeding program would preserve sufficient nutrients in the stored feed crop to enable the Applewhite Dairy to support ninety to one hundred cows.

(2) That use of the Harvestore and vertical farming program would enable the Applewhites to reduce the amount of time and labor devoted to feeding the increased number of dairy animals.

(3) That use of the Harvestore and vertical farming program as outlined and supervised by Peterson would enable the Applewhites to avoid the cost of maintenance of certain fences on the farm.

(4) That storage of the feed crop in the Harvestore would preserve sufficient nutrients to enable the Applewhites to eliminate the need for maintaining a barn for hay storage.

(5) That storage of the feed crop in the Harvestore would preserve sufficient nutrients to enable the Applewhite Dairy to either eliminate or reduce the need for the supplemental feeding of feed concentrates.

(6) That storage of the feed in the Harvestore and feeding in com-

pliance with the vertical farming program would eliminate the need for permanent rotation of pastures and the labor, cost and expense of strip grazing.

(7) That storage of the feed crop in the Harvestore would preserve sufficient nutrients to enable the Applewhites to avoid the purchase and expense of maintaining certain additional farm equipment.

(8) That storage of the feed crop in the Harvestore would produce savings and increased profits to the Applewhites sufficient to meet the cost of the purchase of the Harvestore and attachments.

(9) That continuing supervision, assistance and specific recommendations would be provided at no extra cost by A. O. Smith and H. L. Peterson Company which would insure the results set forth in the representations. When these recommendations were forthcoming, they did not produce the results represented.

These representations were not only false but also fraudulent. Although they did not constitute actual fraud, they nonetheless constituted legal fraud. See 25 Tex.Jur.2d, Fraud and Deceit, §§ 5 and 6.

As an additional inducement to the execution of the purchase order, promissory note and chattel mortgage, Hugh Peterson represented that independent research and studies conducted at Texas A. & M. College confirmed that the use of the Harvestore and vertical farming program would conform with the representations made, and he circulated among the Applewhite family a bulletin from which he made reference to the studies at Texas A. & M. This bulletin, however, if carefully read by an informed dairy man, as the Applewhites are found to be by the Court, would reveal that it had reference to the use of the Harvestore in fattening cattle rather than in feeding a dairy herd. If the Applewhites had carefully read the bulletin, they could have learned that there would possibly be a distinction between the effect of the program on a dairy herd as opposed to the beef cattle herd.

The aforementioned false and fraudulent representations were made to the Applewhites by Hugh Peterson after he had visited and inspected the Applewhite dairy farm, and prior to the execution of the purchase order on December 14, 1959, to induce the execution of the order. The Applewhites, in executing the purchase order, did in fact believe and rely upon the representations, and the Applewhites would not have executed it or the subsequent promissory note and chattel mortgage had such representations not been made to them.

Early in 1960, after the installation of the Harvestore at the dairy and after receiving instructions for its use as prepared by A. O. Smith in its pamphlet and written material furnished to the H. L. Peterson Company, the Applewhites acted in reliance upon the representations by purchasing an additional fifty-two cows so as to approximately double the size of their dairy herd, instituting a program of loading into and feeding from the Harvestore reducing the supplemental feeding of concentrates, spending additional labor and time as required to handle and milk the additional cows purchased, furnishing samples of feed and permitting inspection of their farm and dairy operations on a periodic basis pursuant to requests from H. L. Peterson Company, and obtaining specialized advice and instructions from Texas A. & M. College.

During the summer of 1960 and thereafter, Hugh Peterson advised the Applewhites by correspondence and by verbal instructions to continue their use of the Harvestore and vertical farming program despite its failure to perform in accordance with the representations made. As a result of the continued use by the Applewhites, production from the dairy dropped and continued to drop because the feed crop stored in the Harvestore in compliance with the program instructions failed to provide sufficient nutrition to

the dairy herd, until finally approximately forty-five cows went dry.

Because of the failure of the Harvestore and the vertical farming program to perform as represented by Hugh Peterson, the Applewhites refused as of December 5, 1960 to continue payments under the promissory note. On or about May 31, 1961, the Applewhites tendered return of the Harvestore and attachments to H. L. Peterson Company, but the tender was not accepted.

■■ Hugh Peterson was authorized by the H. L. Peterson Company to bind it by his representations to the Applewhites; however, he was not authorized to bind A. O. Smith and was not its agent. H. L. Peterson Company was merely an independent dealer which purchased equipment manufactured by A. O. Smith and, in turn, sold to customers that it had solicited. There was an arrangement between H. L. Peterson Company and A. O. Smith whereby A. O. Smith would under certain circumstances purchase promissory notes given to the H. L. Peterson Company, but this did not create any agency relationship between these entities. However, the pamphlet and instructional materials provided by A. O. Smith to H. L. Peterson Company were presented to the Applewhites by Hugh Peterson with the authority and consent of A. O. Smith, but these materials did not constitute in and of themselves, and A. O. Smith was not a participant in, any of the fraudulent misrepresentations made to the Applewhites by Hugh Peterson. Therefore, the defense of fraud in the inducement of the note is available against H. L. Peterson Company, but not against A. O. Smith.

■ The purchase order, promissory note and chattel mortgage having been induced by fraudulent material misrepresentations of fact, the "merger clause" and "contractual release of remedies" as set forth in the Terms and Conditions of Sale in the purchase order are of no effect, and parole evidence was properly introduced to prove representations which were not included within the purchase order. See Dallas Farm Mach. Co. v. Reaves, 158 Tex. 1, 307 S.W.2d 233 (1957).

■ The Applewhites contend that they owe no obligation on the purchase order, promissory note and chattel mortgage, because the instruments were issued pursuant to a franchise contract between H. L. Peterson Company and A. O. Smith which was void under Article 7437, Tex.Rev.Civ.Stat., for creating a restraint of trade and for fixing and maintaining prices within the terms and provisions of Article 7426, Tex.Rev.Civ. Stat. This contention is without merit. The Applewhites rely upon the case of Climatic Air Distributors of South Texas v. Climatic Air Sales, Inc., 162 Tex. 237, 345 S.W.2d 702 (1961); however, the basis for the holding in that case, the granting and accepting of the exclusive right to sell a manufacturer's product within a specified territory, is not present in the instant case. Also, the fact that A. O. Smith may from time to time submit a suggested price list to H. L. Peterson Company would not violate the Texas Antitrust Act in situations, such as here, where no evidence was presented that the dealer always agreed or was compelled to sell at the suggested prices. Harcrow v. W. T. Rawleigh Co., 145 S.W.2d 925 (Tex.Civ.App.1940); W. T. Rawleigh Co. v. Fletcher, 275 S.W. 210 (Tex.Civ.App.1925).

■ The Applewhites further contend that A. O. Smith is not a holder in due course of the promissory note executed by them to H. L. Peterson Company and that it is therefore not entitled to recover on the note free from the defense of fraud in the inducement available against the H. L. Peterson Company. However, such is not the case. A. O. Smith, having been found not to have participated in the fraudulent inducement, was a holder in due course of the note within Article 5935, § 52, Tex.Rev. Civ.Stat., when first receiving it from H. L. Peterson Company by endorsement on February 12, 1960.

■ The endorsement of the note by H. L. Peterson Company to A. O. Smith

was not, as alleged, a restrictive endorsement contemplated by Article 5934, § 36, Tex.Rev.Civ.Stat., making A. O. Smith only an agent for collection of H. L. Peterson Company, thereby precluding it from being a holder in due course. The endorsement reads in pertinent part: "Pay to the order of A. O. Smith Corporation WITHOUT RECOURSE, except as provided in collateral Dealer Reserve Agreement between endorser and A. O. Smith Corporation." The Dealer Reserve Agreement provides that H. L. Peterson Company will remain liable to a certain extent to A. O. Smith in the event of non-payment of the note.

▇ The endorsement in question was, therefore, merely a qualified endorsement within Article 5934, § 38, Tex.Rev.Civ.Stat., containing a certain guaranty to A. O. Smith. Neither the qualfied endorsement nor the presence of a guaranty in the endorsement prevents A. O. Smith from obtaining the status of a holder in due course. See Article 5934, § 38, Tex.Rev.Civ.Stat., and Hutches v. J. I. Case Threshing Mach. Co., 35 S.W. 60 (Tex.Civ.App. 1896), writ ref.

▇ A. O. Smith was not the payee of the note, which status would have impaired its holder-in-due-course rights, for the note is specifically payable to H. L. Peterson Company or order, and the name A. O. Smith Corporation appears on the face of the instrument only in reference to the place of payment. See Singer v. National Bond and Investment Co., 218 Ala. 375, 118 So. 561 (1928).

The case of Allied Building Credits, Inc. v. Ellis, 258 S.W.2d 165 (Tex.Civ. App.1953), is inapplicable here, for the basis for the holding in that case of no holder-in-due-course status was that the purchaser of the note required as a condition precedent to his purchase that the payee, his transferor, secure from the maker the execution of an additional instrument, a receipt to the effect that the material for which the note was given had been delivered and installed and all work completed.

▇ Here, A. O. Smith did not require, as alleged by the defendants, that as a condition precedent to its purchase of the note from the payee, H. L. Peterson Company, the payee obtain from the maker defendants a chattel mortgage in a form specified by it. The pertinent Dealer Reserve Agreement provision merely provides that:

"1. The dealer desires to sell to you from time to time, and for a price determined pursuant to (2) certain deferred payment obligations, * * * evidenced *in all cases* by negotiable promissory notes of the purchaser and secured *in some cases* by * * * chattel mortgages or similar instruments granting security interest in goods * * * manufactured by you and sold at retail by the Dealer." [Emphasis supplied.]

The mere reference to another instrument in an otherwise negotiable instrument will not alone affect the rights of a holder in due course. Continental National Bank of Fort Worth v. Connor, 147 Tex. 218, 214 S.W.2d 928 (1948).

▇ Finally, A. O. Smith is not precluded from initially being a holder in due course simply because it is a manufacturer which acquired a promissory note from one of its dealers. However, a manufacturer may be so closely connected with a transaction between its dealer and a custrmer that it is denied holder-in-due-course status, but the Texas cases denying such status for this reason have important distinguishing facts from the instant situation.

In International Harvester Co. of America v. Newberry, 16 S.W.2d 871 (Tex.Civ.App.1929), writ ref., the important fact preventing a manufacturer from being a holder in due course was the participation of one of its agents in the actual sales transaction. That participation was very real, for the agent at the time of the transaction wrote into the sales contract, as demanded by the defendant there, an additional warranty on the part of the seller-dealer.

Here, as already found, H. L. Peterson Company was not an agent of A. O. Smith, and none of A. O. Smith's agents personally participated in the sale or in the obtaining of the promissory note or other instruments.

In Hutches v. J. I. Case Threshing Mach. Co., supra, the dealer had his office in the same building as the manufacturer, the manufacturer had practically the same knowledge of the transaction as the dealer, and, most important, the dealer was the *designer* as well as the seller of machinery manufactured by the manufacturer. Such is not the case here.

In the instant case, the transferee of the note, A. O. Smith, was not in fact the real vendor of the chattel for which the note was executed, nor was the dealer, H. L. Peterson Company, the agent of A. O. Smith. It was merely an independent dealer to which manufactured products were sold for resale, and which had an agreement with A. O. Smith setting forth the circumstances under which it might sell to A. O. Smith notes which were taken in exchange for equipment sold. Therefore, for all the reasons discussed, A. O. Smith is not to be denied initial holder-in-due-course status.

■ Subsequent to becoming a holder in due course, A. O. Smith in September 1960, before the note was in default, discounted it to The First Wisconsin National Bank in Milwaukee, without endorsement. Some time in April 1961, after the note was defaulted, it was re-transferred from the Bank to A. O. Smith, also without endorsement.

Article 5934, § 49, Tex.Rev.Civ.Stat., provides:

"Where the holder of an instrument payable to his order transfers it for value without endorsing it, the transfer vests in the transferee such title as the transferor had therein * *."

No Texas case can be found which interprets this Section in a situation where a payee against whom the maker has a defense endorses the note to a holder in due course who in turn transfers it without endorsement to a third party. Most Texas cases involve situations where the transferor was the original payee against whom the maker had a good defense, Bynum v. Scott, 39 S.W.2d 1108 (Tex.Civ.App.1931), writ ref., and Ellington v. Commercial State Bank, 15 S.W.2d 59 (Tex.Civ.App. 1929), aff'd., Tex.Com.App., 24 S.W.2d 359, or where the plaintiff is not the transferee of the payee, but the note was never endorsed at all and therefore no holder in due course intervened between the payee and the plaintiff, Gibbs v. Wheeler, 306 S.W.2d 929 (Tex.Civ.App. 1957), writ ref., n. r. e.

However, the case of Smith v. Nelson Land & Cattle Co., 212 F. 56 (8th Cir. 1914), did involve a plaintiff-transferee without endorsement from a holder in due course. The Court there held that the transferee under the provisions of the applicable Kansas statute, identical to Texas' Article 5934, § 49, had the same rights as his transferor; and since his transferor was a holder in due course possessing title to the note free from defenses, the transferee was also free from those defenses.

I accept this case as expressing the correct law on the subject, particularly since several Texas cases have asserted that under § 49 the transferee takes title subject to the same defenses available against his transferor. See American Motors Acceptance Corp. v. Heckerman, 332 S.W.2d 345 (Tex.Civ.App. 1960), writ dism'd.; Gibbs v. Wheeler, supra; and Ellington v. Commercial State Bank, supra.

Since A. O. Smith and The First Wisconsin National Bank were not parties to any fraud or illegality affecting the instrument, A. O. Smith is not precluded from recovering on the note by any defenses existing between the Applewhites and the original payee, H. L. Peterson Company, for A. O Smith obtained the same title to the note as possessed by its transferor, the Bank, which obtained the same title as possessed by its transferor, A. O. Smith, which at that time was a holder in due course.

■ A. O. Smith being a transferee deriving its title through a holder in due course, the Applewhites are not entitled to rescission of the purchase order giving rise to the promissory note. Lone Star Olds Cadillac Co. v. Vinson, 168 S.W.2d 673 (Tex.Civ.App.1942), writ ref'd., w. o. m.; Ford v. Oliphant, 32 S.W. 437 (Tex.Civ.App.1895); 51 Tex.Jur.2d, Sales, § 325. Therefore, A. O. Smith is entitled to recover on the promissory note, and the Applewhites are not entitled to recover against it on their counterclaim.

H. L. Peterson Company asserts that it is not liable on the Applewhites' counterclaim for two reasons. The first is that the statute of limitation had barred the counterclaim, since more than two years had expired before it was filed in this Court. The second is that this Court possesses no jurisdiction of the counterclaim because of lack of diversity of citizenship between the Applewhites and H. L. Peterson Company.

The Applewhites contend that the counterclaim is not barred by limitation since, although the cause of action was not filed in this Court within the prescribed two-year period, it was filed in state court within the proper time. H. L. Peterson Company, on the other hand, contends that the filing of the suit in state court does not toll the statute of limitation for purposes of the federal court suit unless the state court action was dismissed prior to the filing in the federal court, which did not occur here. The answer lies in the interpretation to be given to Article 5539a, Tex.Rev.Civ. Stat., which provides:

"When an action shall be dismissed in any way, or a judgment therein shall be set aside or annulled in a direct proceeding, because of a want of jurisdiction of the Trial Court in which such action shall have been filed. and within sixty (60) days after such dismissal or other disposition becomes final, such action shall be commenced in a Court of Proper Jurisdiction, the period between the date of first filing and that of commencement in the second Court shall not be counted as a part of the period of limitation unless the opposite party shall in abatement show the first filing to have been in intentional disregard of jurisdiction."

■■ Although there is a division of opinion on the question of whether dismissal of a prior action is a prerequisite to "triggering" into operation statutes such as 5539a, the Fifth Circuit in Hicks v. Fordham, 246 F. 236 (5th Cir. 1917), in interpreting a Georgia statute similar to 5539a, held that the statute of limitation was tolled even though the federal court suit was brought prior to dismissal of the state court suit. See also, 83 A.L.R. 488. The Court here is bound to follow that holding as the proper interpretation of Article 5539a.

■ H. L. Peterson Company's second contention is also resolved against it, for this Court does have jurisdiction over the Applewhites' counterclaim. I construe the counterclaim to be a compulsory one encompassed by Rule 13(a), Federal Rules of Civil Procedure. Under such a counterclaim, jurisdiction is not destroyed by lack of jurisdictional requisites between the counterclaimant and any third party against whom he moves. Union Paving Co. v. Downer Corp., 276 F.2d 468 (9th Cir. 1960); United Artists Corp. v. Masterpiece Productions, Inc., 221 F.2d 213 (2d Cir. 1955); Mayer v. Chase Nat'l. Bank, 165 F.Supp. 287 (S.D.N.Y.1958).

Although the Fifth Circuit in Reynolds v. Maples, 214 F.2d 395 (1954), without distinguishing between a compulsory and a permissive counterclaim, stated that when third parties are brought into a case by counterclaim there must be the requisite jurisdictional requirements existing between the counterclaimant and the third parties, the opinion has been distinguished on the ground that the court must have thought that the counterclaim was not compulsory. See United Artists Corp. v. Masterpiece Productions, Inc., supra, 221 F.2d at 213, note 4. In any event, doubt is cast upon the

holding in Reynolds v. Maples, supra, by the recent ruling of the Fifth Circuit that a cross-claim under Rule 13(g) is to be considered ancillary to the main action, and thus maintainable without any independent ground of federal jurisdiction. Childress v. Cook, 245 F.2d 798, 802–805 (5 Cir. 1957). See also United States for Use and Benefit of Los Angeles Testing Laboratory v. Rogers & Rogers, 161 F.Supp. 132, 134 (S.D.Calif.1958). Therefore, this Court does have jurisdiction over the counterclaim asserted by the Applewhites against H. L. Peterson Company.

▮ As previously discussed, since the Applewhites' promissory note has passed into the hands of a holder in due course, the Applewhites are not entitled to rescission but are only entitled to damages. The normal rule of damages for fraudulent representation is the difference between the value of what was parted with and what was received under the contract. Dallas Farm Mach. Co. v. Reaves, 158 Tex. 1, 307 S.W.2d 233 (1957); Massey-Ferguson, Inc. v. Easterwood, 363 S.W.2d 897 (Tex.Civ.App. 1963), writ ref., n. r. e.; Morriss-Buick Co. v. Pondrom, 131 Tex. 98, 113 S.W. 2d 889 (Tex.Comm.App.1938), adopted by Sup.Ct.

The value of what was parted with is evidenced by the promissory note. The value of what was received, the Harvestore, apart from its value as applied to the use to which it was intended to be put in the particular area where it was to be used, is not present from the evidence. It was, however, alleged and proven that the Harvestore was much less effective than ordinary dairying operations; it was even shown to be detrimental to those operations. Under these circumstances, although the Harvestore may have some value for other uses in other areas, it may be said, and correctly so, that it was useless for dairy operations in the particular area here involved. Particularly is this so since dairying operations could be carried out much more effectively without its use, and since its only purpose and use

to the Applewhites was to make dairying operations more profitable than could be carried out under the ordinary procedures of dairy farming.

"The true measure [of damages] in every case of this kind [cases of fraudulent representation] is that rule which gives to the complaining party the actual amount of his loss resulting directly and proximately from the fraud practiced upon him." Morriss-Buick Co. v. Pondrom, supra at 890. Under the circumstances of this rather peculiar case, the true measure of damages for actual loss would be the amount of the promissory note and nothing more. Therefore, the Applewhites are entitled to recover from H. L. Peterson Company the amount represented by the promissory note given for the Harvestore, but are not entitled to any other damages. On the other hand, since the Harvestore might possibly be used in other types of farming in other areas, it would be unjust for the Applewhites to continue to keep the Harvestore; therefore, H. L. Peterson Company is entitled to its return.

▮ The Applewhites having recovered on the ground of fraudulent representation, they are not also entitled to recover for breach of warranty, because the remedies are in the alternative. 23 Am.Jur. 758, 46 Am.Jur. 860.

Clerk will file this Memorandum Opinion and send a copy to each respective counsel. Counsel for defendants Applewhite will prepare an appropriate order of judgment and furnish same for consideration by the Court on or before April 8, 1965.

On Supplemental Memorandum Opinion:

The Court, after hearing argument of counsel on the motion for judgment and for revision of the Court's opinion filed by A. O. Smith Corporation and H. L. Peterson, supplements and modifies its original memorandum opinion of March 26, 1965, as follows:

▮ The chattel mortgage involving the Harvestore in this case as well as the promissory note which it secured were assigned to A. O. Smith Cor-

poration. Since A. O. Smith's original petition prays for foreclosure of the chattel mortgage and since it is a holder in due course of the note, it is entitled to the foreclosure, and such is hereby granted. A. O. Smith's recovery against the Applewhites would therefore be the value of the promissory note less an offset for the recoverable amount of the Harvestore receivable under the appropriate foreclosure proceedings.

■■■ Since, as found in the original memorandum opinion, the Applewhites are entitled to recover from H. L. Peterson for fraudulent representations, and since the measure of damages in such cases is "that rule which gives to the complaining party the actual amount of his loss resulting directly and proximately from the fraud practiced upon him," Morriss-Buick Co. v. Pondrom, 131 Tex. 98, 113 S.W.2d 889 (Tex.Comm.App.1938), adopted by Sup. Ct., the Applewhites are entitled to recover from H. L. Peterson Company the amount it is required to pay to A. O. Smith Corporation under the promissory note. This holding is in accord with the Court's finding in its original memorandum opinion that such was the only loss suffered by the Applewhites resulting from the fraudulent representations.

Further revision of the Court's original memorandum opinion for the reasons asserted in the motion for judgment and for revision of Court's opinion is denied.

The Court, however, will elaborate on its action in regard to the statute-of-limitations question presented in that motion.

■■■ The case of Scurlock Oil Co. v. Three States Contracting Co., 272 F. 2d 169 (5th Cir. 1959), relied upon by the movants for their limitation position, holds in essence that Article 5539a, Tex.Rev.Civ.Stat.Ann., may not be relied upon where a court dismisses a case for reasons other than for a want of jurisdiction. Such is not the situation here, for no dismissal occurred in this case.

This is evident from Exhibit 1 of counter-defendant H. L. Peterson Company admitted in evidence by the Court at the hearing on the motion for judgment and for revision of the Court's opinion, and from other evidence in the record. The filing in state court tolled the statute of limitations on this cause of action, and it does not admit of reason that once the statute is so tolled it should not also be tolled for purposes of bringing a counterclaim or cross-claim involving the cause of action in federal court. Therefore, the Court holds that a statute would be tolled independent of Article 5539a, which appears to be applicable only in dismissal situations. Nonetheless, the Court also holds that the statute of limitations was tolled by operation of Article 5539a.

Authority for both holdings of the Court is provided by the United States Supreme Court decision of Burnett v. New York Cent. R. R., 380 U.S. 424, 85 S.Ct. 1050, 13 L.Ed.2d 941 (1965). Although dealing with the question of whether the suit of the petitioner there in state court, which was dismissed for lack of venue, tolled the F.E.L.A. statute of limitations in a subsequent federal court suit, that case's discussion of the general principles involving statutes of limitations is applicable to this Court's holding that the pending state court suit tolled the statute of limitations on the counterclaim or cross-claim in federal court. The Court states:

"Statutes of limitations are primarily designed to assure fairness to defendants. Such statutes 'promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them.' Order of Railroad Telegraphers v. Railway Express

Agency, Inc., 321 U.S. 342, 348–349 [64 S.Ct. 582, 586, 88 L.Ed. '788]. Moreover, the courts ought to be relieved of the burden of trying stale claims when a plaintiff has slept on his rights [footnote omitted].

"This policy of repose, designed to protect defendants, is frequently outweighed, however, where the interests of justice require vindication of the plaintiff's rights. * * *

" * * * Petitioner here did not sleep on his rights but brought an action within the statutory period in a state court of competent jurisdiction. Service of process was made upon the respondent notifying him that petitioner was asserting his cause of action. While venue was improper in the state court, under Ohio law venue objections may be waived by the defendant [footnote omitted], and evidently in past cases defendant railroads, including this respondent, had waived objections to venue so that suits by nonresidents of Ohio could proceed in state courts [footnote omitted]. Petitioner, then, failed to file an FELA action in the federal courts, not because he was disinterested, but solely because he felt that his state action was sufficient. Respondent could not have relied upon the policy of repose embodied in the limitation statute, for it was aware that petitioner was actively pursuing his FELA remedy; in fact, respondent appeared specially in the Ohio court to file a motion for dismissal on grounds of improper venue."

The defendants here did not sleep on their rights, but brought an action in a state court of competent jurisdiction. Service of process was made upon the plaintiff and counter-defendants notifying them that the defendants were asserting a cause of action. Plaintiff and counter-defendants cannot rely on the policy of repose here, for they were well aware that the defendants were asserting their cause of action embodied in the counterclaim, even before the plaintiff filed the lawsuit in this court.

Moreover, the Supreme Court opinion in Burnett, supra, further supports my conclusion by throwing doubt upon the correctness of Scurlock, relied upon by movants, A. O. Smith Corporation and H. L. Peterson Company, who cite Scurlock as authority for the proposition that Article 5539a applies only in the situation where a court has first dismissed a case for want of jurisdiction, which did not occur here. In Burnett the Court states that state "savings" statutes (and in footnote 9 it refers to Texas' Art. 5539a as well as to the statutes of other states) provide for the tolling of statutes of limitations in situations of dismissals for improper venue, which of course do not amount to dismissals for lack of jurisdiction, the interpretation of the statute made the basis of the holding in Scurlock.

Therefore, I reaffirm my original holding that defendants' counterclaim here was not barred by the statute of limitations.

Counsel for A. O. Smith Corporation will submit an appropriate foreclosure decree, and counsel for the Applewhites will submit an appropriate final decree, in accordance with the Court's original memorandum opinion as modified and supplemented by this supplemental memorandum opinion.

Clerk will file this supplemental memorandum opinion and send a copy to respective counsel.